No. 47,212

STATE OF KANSAS, *Appellee,* v. WILLIAM WALLACE LAW, *Appellant.*

(522 P. 2d 320)

Opinion filed May 11, 1974.

*George A. Groneman,* of White and Groneman, Chartered, of Kansas City, argued the cause and was on the brief for the appellant.

*Philip Sieve,* Assistant District Attorney, argued the cause, and *Vern Miller,* Attorney General, and *Nick A. Tomasic,* District Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Defendant appeals from convictions by a jury of two counts of burglary (K. S. A. 1973 Supp. 21-3715). He was sentenced under K. S. A. 1973 Supp. 21-4501 (*d*) for a term of from two to ten years on each count, the sentences to run concurrently. The charges stemmed from burglaries of a Vickers Service Station and the Muncie Bowl, a bowling alley in Kansas City, Kansas.

Defendant seeks reversal on the ground of the erroneous admission into evidence of two confessions and on the further ground that the trial court erred in excluding a portion of his testimony.

In the early morning of November 10, 1971, patrolman Harold Bruce, of the Kansas City, Kansas police department, interrupted a burglary taking place at Kenny's Vickers Service Station in Kansas City, Kansas. Officer Bruce saw two subjects running from

the station to an automobile. Bruce immediately broadcast descriptions of the automobile and the two men. About five minutes later defendant and Lewis Holden were stopped in an automobile answering the description on an approach to the Lewis & Clark viaduct which leads into Kansas City, Missouri. The two patrolmen who stopped defendant and Holden advised them of their rights and detained them until the arrival of detective Tom Rose. Rose again advised defendant of his rights and was told by defendant that he did not wish to make a statement or to be interrogated. Defendant was taken to the city jail where he was booked.

Later in the morning detective Wright, of the Crimes Against Property Unit of the police department, took over the investigation of the case. Wright testified that he had two conversations with defendant concerning the two burglaries with which defendant was later charged. Wright testified that on each occasion he gave defendant the Miranda warning (*Miranda v. Arizona*, 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974) and fully advised him of his constitutional rights. On both occasions defendant was given a written form setting out his constitutional rights and a waiver thereof which stated that the subscriber had read and understood the statement of his rights; that he did not want a lawyer at the time; that he was willing to make a statement and answer questions, understood what he was doing; that no promises or threats had been made; and that no pressure or coercion of any kind had been used against him. Defendant signed the forms preceding each conversation with Wright. The first conversation took place at 7:25 a. m. on November 10. The questions and answers were reduced to writing in the form of a statement which was signed by defendant.

The first statement described defendant's participation with Lewis Holden in the burglary of the Vickers Station. Later, Holden was interviewed and gave a statement which implicated defendant in the burglary of the Muncie Bowl. With this information at hand detective Wright again interviewed defendant at 11:20 a. m. the morning of November 11 at which time the second statement of defendant in which he admitted participating in the Muncie Bowl burglary was taken, reduced to writing, and signed by defendant. Thereafter a complaint was filed charging defendant with the two counts of burglary. Apparently, the complaint was not filed until November 22. No explanation concerning the delay appears in the record.

Defendant filed a motion to suppress the two statements. A full evidentiary hearing was had before the trial court, and portions of the testimony of Wright and defendant are reproduced in the record. The motion to suppress was denied. During the trial, which was commenced on March 28, 1972, detective Wright and defendant again testified concerning the circumstances surrounding the taking of the statements.

On appeal defendant specifies two points of error both of which are related to the admission of his statements into evidence. Defendant's first point is stated as follows:

"It was reversible error to admit into evidence over defendant's objection two written confessions extracted from the defendant in violation of the fifth and fourteenth amendments to the United States Constitution because both statements were taken from the defendant without the assistance of counsel after he had expressed a desire not to talk to police officers without an attorney, and because said confessions were the result of illegal detention, threats and promises, and therefore, involuntary."

In his brief defendant says that his uncontroverted testimony on the motion to suppress and at trial was that following his arrest, detective Rose threatened him with physical abuse and refused to give him an attorney when he declined to give a written statement, sign a waiver form or speak without the assistance of counsel. Defendant further says that although endorsed as a witness, Rose did not testify at the hearing on the motion to suppress or at trial to contradict the testimony of defendant in this regard. The testimony of defendant given on the motion to suppress, which is reproduced in the record, does not relate to the circumstances surrounding his arrest, but recites his version of the events which took place at the city hall after his arrest. Defendant testified that Holden was examined first and after twenty to twenty-five minutes defendant was fingerprinted and then questioned by an officer identified by defendant as detective Woodson; we think, however, it must have been detective Rose. Defendant testified that Woodson showed him a statement signed by Holden and told defendant that if he did not sign a statement he (Woodson) would bash his head against the wall. Defendant says he refused to talk and further testified "They took me directly upstairs because I wouldn't talk." He also testified that when he asked for an attorney the officer told him, "You don't need no attorney. . . . We can't help you out, anyway." At trial, defendant again related his version of events at the police station following his arrest and that when he refused

to talk he was put in jail. Defendant testified that he did not believe he was permitted to make a telephone call the night of his arrest. Defendant's testimony concerning the taking of his statement the next morning is in sharp conflict with the testimony of detective Wright. Defendant testified that after breakfast he was taken from the jail to see Wright; that he did not believe he was advised of his constitutional rights; and that he told Wright and other officers present that "I'm not signing nothing, I want to see a lawyer on the spot." When asked how he came to sign the waiver of rights and the written statement, defendant testified that he was told that Wright had a confession from Holden and that he (defendant) did not know who to turn to; that they wouldn't get him a lawyer and so he went ahead and signed the statement. Defendant did admit that he had been permitted to make one telephone call. Concerning his reasons for signing the second waiver of rights and written statement, defendant testified:

"Because for the simple reason they were throwing all kinds of questions at me and I did not know what to do or who to turn to. They wouldn't get me a lawyer or nothing, so I went ahead and signed them on my own."

Detective Wright testified that he was assigned to the Crimes Against Property Unit; that when he reported for duty on the morning of November 11 he was assigned by his lieutenant to get defendant and Holden out of jail to make a follow-up on the case and see if they wanted to make a statement. Wright testified that he knew defendant had told officer Rose the night before that he did not want to talk. Wright knew that defendant had been in custody for about five or six hours and that he had been booked for burglary and vagrancy investigation. Wright further testified that defendant and Holden were together when he talked to them; that he fully advised defendant of his rights; and that defendant did sign a rights waiver and was willing to make a statement about the Vickers burglary. After taking defendant's first statement at 7:30 a. m. the morning of November 10, defendant was returned to jail and detective Wright proceeded to take a statement from Holden and to further investigate the case. At 11:20 a. m. the following day, November 11, Wright again had defendant brought down from the jail. Wright once again instructed defendant concerning his rights and defendant signed a second rights waiver. Wright then told defendant that Holden had given a statement which was given to defendant to read. At this point, according to Wright, defendant

stated that he wished to give another statement. Defendant's second statement concerning the Muncie Bowl burglary was typed and signed by defendant. Wright further testified that defendant was permitted to make two or three telephone calls and that one was completed, but Wright did not know whom defendant had talked to.

Defendant asserts that Wright knew that he (defendant) had asked for an attorney the night of his arrest. The record is not clear on this point. Wright's testimony is definite that defendant never asked for an attorney in connection with the taking of the two statements. As to whether he (Wright) knew if defendant had asked for an attorney the night of his arrest, Wright testified that he had some information apparently from a report of detective Rose that defendant had said he would not talk without an attorney present. In any event, the record is clear that when defendant refused to talk the night of his arrest interrogation was not pursued by the officers, but defendant was put in jail within a few minutes and not seen again until after breakfast the next morning.

No contention is made that the Miranda warnings given were in any manner deficient, and it is conceded the warning was given by detective Rose the night of defendant's arrest and again on each occasion preceding the statements given to detective Wright. Defendant's position appears to be that whenever the warnings required by Miranda are once given to a defendant in custody, the warnings coupled with an inquiry whether defendant wishes to make a statement must be regarded as the commencement of an interrogation, and that if the defendant indicates a desire to remain silent such action not only invokes defendant's constitutional right to remain silent, but to have counsel and forecloses, under any circumstances, the introduction of any later statement made without the presence of a lawyer. We believe the position taken by defendant in this regard reaches beyond the scope of Miranda prohibitions and conflicts with previous declarations of this court on the subject. In support of his position defendant quotes from *Miranda v. Arizona,* supra:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off

questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. . . ." (pp. 473, 474.)

We recognize, of course, the teaching of Miranda that law enforcement officers are not to be permitted to attempt in-custody interrogation and if met by a refusal to return the defendant to jail and then repeat the procedure periodically until a statement is obtained. However, we do not stretch this prohibition to invalidate a statement given after an otherwise valid voluntary waiver of both the right to counsel and the right to remain silent is knowingly and intelligently made. When confronted with the identical quotation from *Miranda* set forth above, in an analogous case, the United States Court of Appeals (5th Cir. 1968) had this to say in *Jennings v. United States,* 391 F. 2d 512, cert. den. 393 U. S. 868, 21 L. Ed. 2d 136, 89 S. Ct. 154:

"We do not agree with these contentions. It seems clear to us that what the Court sought to interdict in *Miranda* were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take 'no' for an answer. Disregarding his constitutional claim, they continue to ask questions, see 384 U. S. at 453, 86 S. Ct. 1602, 16 L. Ed. 2d 694. These techniques were not used in this case. It is admitted that the local police ceased interrogation immediately upon appellant's expression of an unwillingness to proceed further." (p. 515)

In *State v. Godfrey,* 182 Nebr. 451, 155 N. W. 2d 438, cert. den. 392 U. S. 937, 20 L. Ed. 2d 1396, 88 S. Ct. 2309, a similar case in which a statement was subsequently taken after defendant had initially invoked his right to silence; the Nebraska court with respect to the application of Miranda dealt with the problem in this manner:

"From the evidence here, when the police received the 'no' answer at the early morning interview made in connection with booking procedures, the interview was stopped. This should have demonstrated 'that his interrogators are prepared to recognize his privilege should he choose to exercise it.' Miranda clearly requires that if a defendant in custody at any time indicates that he wants an attorney before speaking to the police, any interrogation must cease until an attorney is present and the right continues to have the attorney present during any subsequent questioning. It is not clear that the same right to have an attorney present arises solely from a defendant's indication at a specific time that he does not then wish to make a statement or answer a question where, as here, he does not ask for an attorney. This is particularly true where the police do not question him after such indication while investigation in the field is carried out for a few hours. We recognize that the police cannot be permitted to attempt an in-custody interrogation

and, upon being met with a refusal, return a prisoner to his cell and then attempt to repeat the procedure periodically until a statement is obtained. However, an otherwise valid voluntary waiver of both the right to counsel and the right to remain silent, knowingly and intelligently made, followed by a statement, should not be transformed into invalidity merely because of silence at some prior time. One refusal to make a statement, when that refusal is fully honored, ought not to taint the substance of the entire subsequent procedures under the circumstances here." (pp. 455, 456.)

Returning to the instant case, when the police received a "no" answer at the station house, following defendant's arrest; according to his own testimony, the interrogation was immediately dropped and defendant was put in jail. This served to put defendant on notice that all he needed to do to halt interrogation was to give a negative response. Detective Wright's testimony that the statements subsequently taken were entirely voluntary is corroborated by defendant's signature of the written waivers read by him which waived his rights to counsel and to remain silent. The question of voluntariness was for the trial court, and our responsibility on appellate review is limited to a determination whether there is competent substantial evidence to support its findings.

In *State v. Creekmore*, 208 Kan. 933, 495 P. 2d 96, we were confronted with the admissibility of an extrajudicial statement given in-custody interrogation taking place during the second visit of a detective to a prison farm wherein the defendant had been confined for several weeks. Guidelines governing a trial court's consideration were set forth and we held:

"The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. Generally if the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary.

"When the trial court conducts a full preliminary inquiry on the admissibility of an extrajudicial statement given by an accused, determines the statement was freely, voluntarily and intelligently given and admits the statement into evidence at the trial, this court on appeal should accept that determination if it is supported by substantial competent evidence." (Syl. ¶¶ 1, 2.)

We believe the record before us clearly indicates that defendant was fully cognizant of his alternatives. By reason of his experience the night of his arrest he was fully aware that he could immediately terminate any interrogation by merely saying "no." Detective Wright's testimony of the absence of coercion or promises and the explanation of defendant's rights, including his right to waive, coupled with the reading of the waiver of rights form by defendant

and his signature thereof, is ample evidence to support the trial court's ruling.

For his second and final point on appeal defendant asserts error in the exclusion of his testimony that he had not been arraigned or taken before a judge until after he had given the two written confessions and had been detained in custody for over thirty-three hours. The matter complained of by defendant appears in the record as follows:

"Q. When did they tell you that you would get a lawyer, if ever?

"A. They told me I would be able to get a lawyer when I went in front of the city judge.

"Q. And did they tell you when that would be?

"A. No, sir, they did not.

"Q. Were you taken before a judge that day and was there a bond set?

"A. No, sir, it was a couple of days.

"MR. HOLBROOK: I am going to object to that. We are getting far afield.

"THE COURT: You will be sustained. The last question and answer will be stricken."

The defendant says the excluded testimony had a direct bearing on the admissibility of defendant's confessions and that the jury might have inferred that the police might have overlooked other rights of the defendant in obtaining the confessions in view of their disregard of defendant's constitutional rights by detaining him illegally. The state responds that all of defendant's testimony concerning his allegations of coercion, duress, threats of physical abuse, and the time of giving the statements in relation to the time of arrest, had been submitted to the jury. The state maintains that the ruling of the court was within its sound discretion and even if erroneous it does not remotely approach reversible proportions.

Concerning the admissibility of a confession K. S. A. 1973 Supp. 22-3215 (5) provides:

"The issue of the admissibility of the confession or admission shall not be submitted to the jury. The circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission."

This court has held that a confession obtained during a period of illegal detention is not inadmissible if voluntarily made and not the product of the detention. (*Wheeler v. State*, 202 Kan. 134, 446 P. 2d 777; *Cooper v. State*, 196 Kan. 421, 411 P. 2d 652; and *State v. Stubbs*, 195 Kan. 396, 407 P. 2d 215.) Needless to say, we do not approve of unwarranted delay in taking a suspect before a proper magistrate; however, any issue as to whether defendant's confes-

sions were freely and voluntarily made or a product of the delay in taking him before a magistrate was resolved by the trial court. As to the exclusion of defendant's testimony concerning his detention, the jury had been made fully aware, by previous testimony, of the time lapse between defendant's arrest and the giving of the statements. We find no abuse of discretion in this regard which rises to the level of reversible error.

While not specifying error on the point, defendant in his brief suggests the state was derelict in not producing detective Rose as a witness on the motion to suppress and at trial. Detective Rose was not present at the taking of either of the two statements in question and knew nothing of the circumstances. Rose's knowledge was limited to the circumstances surrounding defendant's arrest and events immediately following at the station house.

The critical issue before the trial court in this case was whether the state sustained its burden of establishing the voluntariness of defendant's statements. The trial court resolved the issue by weighing the testimony of detective Wright, coupled with the signed waiver forms and statements, against the testimony of defendant and found adversely to defendant.

We hold that the state sustained its burden of proving the challenged statements to be admissible.

The judgment is affirmed.