No. 66,070

STATE OF KANSAS, *Appellee,* v. ELBERT C. DIXON, *Appellant.*

(843 P.2d 182)

Opinion filed December 11, 1992.

*Lucille Marino,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Jeffrey E. Goering,* assistant district attorney, *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by Elbert C. Dixon from his conviction by a jury of one count of attempted first-

degree murder, K.S.A. 1989 Supp. 21-3301; K.S.A. 1989 Supp. 21-3401. His sentence is 15 years to life imprisonment.

At approximately 10:00 p.m. on March 19, 1990, Elbert Dixon shot Marva Bell in the chin. Bell and Dixon had lived together until approximately two weeks before the shooting. Bell testified that she and her children had moved back to her father's house because Dixon had beaten her, threatened her at knifepoint, and taken her rent money and spent it on cocaine.

Bell first saw Dixon on the day of the shooting when he knocked on the living room window of her father's house and asked her to come outside. They talked through the open window for about five minutes. Dixon asked if he could come in to see Bell's small daughter. Bell testified that she said no, but that he came in anyway. Dixon entered the house through the back door and stayed approximately 20 minutes. Dixon told Bell that he was hungry, that nobody loved him, and that he was depressed. She fed him, and he ate outside the house.

Dixon stated to the police that he stayed at Bell's about half an hour that afternoon. He left at approximately 4:30 p.m. to check into a shelter.

As he was walking to the shelter, Dixon stopped and called Bell. After checking in at the shelter, Dixon went to a cousin's house and called Bell again. Dixon talked to Bell's daughter and got the idea that Bell had someone else at the house with her.

Before returning to Bell's, Dixon consumed two pieces of crack cocaine. He told police that he used the cocaine about an hour before shooting Bell.

Dixon had a .38 revolver hidden at some empty apartments. He got the gun and went to Bell's house. Dixon said, "I thought I was gonna scare her."

Bell next saw Dixon when he returned to her father's house about 10:00 p.m. Dixon spoke to Bell through the living room window. Bell testified that she told Dixon to leave her alone.

When Bell went into the kitchen to prepare a bottle for her daughter, Dixon went to the back door and knocked. Bell went to the door and raised the shade on the back door window. Bell testified that she told Dixon in strong terms to leave her alone. Bell lowered the shade and walked away from the back door window.

Dixon continued knocking. Bell returned to the window and told Dixon to leave her alone. Through the window Bell saw Dixon pointing a gun at her. Bell testified that Dixon's arm was out straight and level as he pointed the gun at her and that he was close to the window. Bell testified that Dixon said, "If I can't have you, can't nobody else have you." Then he shot her in the chin.

Dixon told the police that he and Bell talked through the back window. Bell said he was a bum and no good. Dixon said that she was hurting him and he wanted to hurt her and to make her stop saying those things. He shot her from about 12 inches away. He said that he "really didn't want to do it."

There were three bullets in the gun. Dixon fired once. He did not know whether there was a bullet in the chamber or not.

After he shot Bell, Dixon ran to a cousin's house. For a short time he hid, and then he surrendered to police custody on a nearby street corner.

Bell testified that Dixon was smoking cocaine throughout the period from May 1989 to March 1990. Bell testified that about a week before the shooting Dixon had spent $1,300 on cocaine.

The first issue asserted by defendant on appeal is whether the district court erred in failing to instruct the jury on the lesser included offenses of attempted second-degree murder and attempted voluntary manslaughter. The jury was instructed on the alternative charges of attempted first-degree murder and aggravated battery.

Under K.S.A. 21-3107(3), the district court has a duty to instruct on lesser offenses as the evidence may justify, even though the instructions have not been requested. *State v. Clark*, 214 Kan. 293, Syl. ¶ 4, 521 P.2d 298 (1974). The requirement of 21-3107(3) "is based upon the right of a defendant to have his theory of the case presented to the jury under appropriate instructions where there is support in the evidence." *State v. Guebara*, 236 Kan. 791, 795, 696 P.2d 381 (1985). Such instructions must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. *State v. [Cain] Dixon*, 248 Kan. 776, Syl. ¶ 1, 811 P.2d 1153 (1991).

For purposes of 21-3107(2), the crimes of attempted second-degree murder and attempted voluntary manslaughter are in-

cluded crimes of a lesser degree of attempted first-degree murder. See *State v. Seelke,* 221 Kan. 672, 675, 561 P.2d 869 (1977) (murder in the second degree and voluntary manslaughter are lesser degrees of murder in the first degree).

The defendant's theory was that he took the gun to Bell's house with the intent to scare her, and when he shot the gun, he wanted to silence or injure the victim but not kill her. Dixon's theory comports with the evidence of his statements to the police, and it is reflected in the instruction on aggravated battery.

The State's theory was that Dixon shot Bell in the face with the premeditated intent to kill her. The State's theory is reflected in the instruction on attempted first-degree murder.

Dixon argues that the instructions which were given by the district court represent the opposite ends of a continuum of possible instructions which are supported by the evidence. At one end is intentionally, deliberately, and with premeditation attempting to kill; at the other end is intentionally touching or applying force with the intent to injure. The instructions which lie between the extremes are attempted second-degree murder and attempted voluntary manslaughter. Dixon argues that the evidence which supports the instructions at the extremes necessarily would support those lying in between.

The major problem with defendant's argument is that the basic notion of the continuum is flawed because aggravated battery is not a lesser included offense of attempted first-degree murder. *State v. Daniels,* 223 Kan. 266, Syl. ¶ 3, 573 P.2d 607 (1977). Another problem with the notion is that it tends to oversimplify the elemental differences among the offenses.

Second-degree murder "is the malicious killing of a human being, committed without deliberation or premeditation." K.S.A. 21-3402. The pattern instruction states that to establish the charge of second-degree murder, the following must be proved: (1) that the defendant intentionally killed the victim and (2) that the killing was done maliciously. PIK Crim. 2d 56.03. "Maliciously" means "willfully doing a wrongful act without just cause or excuse." PIK Crim. 2d 56.04(a) (citing *State v. Egbert,* 227 Kan. 266, 606 P.2d 1022, *cert. denied* 449 U.S. 965 [1980]). "Willfully" means "conduct that is purposeful and intentional and not accidental." PIK Crim. 2d 56.04(c) (citing K.S.A. 21-3201[2] and *State*

*v. Osburn*, 211 Kan. 248, 505 P.2d 742 [1973]). "Intentionally" means "conduct that is purposeful and willful and not accidental." PIK Crim. 2d 56.04(d) (citing K.S.A. 21-3201[2] and *State v. Stafford*, 223 Kan. 62, 65, 573 P.2d 970 [1977]). Premeditation is an element of first-degree murder but not of second-degree murder. In all other respects the elements of the crimes are the same. *State v. [Cain] Dixon*, 248 Kan. at 782. "Deliberately and with premeditation" means "to have thought over the matter beforehand." PIK Crim. 2d 56.04(b) (citing *State v. McGaffin*, 36 Kan. 315, 319, 13 Pac. 560 [1887]), in which premeditation was said to mean "that the accused planned, contrived and schemed beforehand to kill" the victim.

The State takes the position that "if there was an intent to kill, it was a premeditated intent to kill." In support, the State points to Bell's testimony that Dixon said, "If I can't have you, can't nobody else have you." The State also points to Dixon's taped statement that after the shooting he was thinking that he finally had killed Bell, to the inference to be drawn from Dixon's shooting Bell at close range with a .38 handgun, and to Dixon's returning to Bell's house with a loaded gun after he became suspicious that there was someone else in the house with her.

The duty of the district court to instruct on a lesser included offense "arises only where there is evidence upon which the accused might reasonably be convicted of the lesser offense." *Seelke*, 221 Kan. at 675. Because reasonableness is an element of this test, there is some weighing of the evidence which occurs. A finding of sufficient evidence tending to show the lesser degree of the crime triggers the duty. See, *e.g., Guebara*, 236 Kan. at 795. The weighing of evidence, however, is not a retrial of the case.

In *[Cain] Dixon*, this court concluded that the evidence which tended to show the lesser offense was not evidence which reasonably would support a conviction of the lesser offense. This court stated: "Under the facts of this case and in light of the overwhelming evidence presented at trial, we find the defendant's sole statement denying intent to kill or harm the victim was insufficient to support a finding of involuntary manslaughter." 248 Kan. 776, Syl. ¶ 8.

In the present case, even though Dixon was the source of most, if not all, the evidence tending to show the absence of deliberation or premeditation, that evidence does not consist solely of a self-serving declaration that his action lacked those qualities. The defendant did not testify at trial, and the evidence consisted of statements made shortly after the shooting. In this respect the present case is distinguishable from [*Cain*] *Dixon*.

In *Seelke*, we examined the evidence and reversed the conviction because the district court had failed to instruct on a lesser offense. This court concluded that the evidence reasonably would support a conviction of the lesser offense, involuntary manslaughter. The conclusion was reached despite some inconsistencies in the defendant's statements and substantial State's evidence tending to establish a greater offense. See 221 Kan. at 675-81.

In *Seelke*, the defendant shot and killed her husband, who recently had been released from psychiatric care. He arrived home after drinking. Defendant testified that he hit her, bit her, threatened her and their twin babies, strangled her, and forced her to have intercourse. When he again threatened to kill her and the babies, she grabbed a shotgun that was close to the bed and shot him three times, reloaded as he continued to threaten her, and fired a fourth shot. 221 Kan. at 673.

The State presented testimony of a companion who accompanied the husband home that the defendant threatened her husband and his companions if they did not leave. He testified that he saw her silhouette inside the house holding a shotgun. 221 Kan. at 673. The State's evidence also showed that she replied to her husband's knock on the door, "You can't come in and if you do I will shoot you." 221 Kan. at 675. She had to pump the second and third shells into the chamber before firing them and reload before firing the fourth shot. At first defendant denied reloading, but later admitted it. Defendant testified that her husband told her that if she shot him she had better kill him.

In the present case, there is evidence which tends to show the lesser offense of attempted second-degree murder. Less than an hour after consuming crack cocaine, Dixon went to Bell's house. His thinking processes may have been disorganized. He believed that there was somebody else at the house with Bell. He took a gun with him, he said, to scare Bell. They were talking

through the window in her back door. Bell called Dixon "no good" and a "bum." Dixon was angry; he wanted to shut her up. He fired once. There were three bullets in the revolver, and when he pulled the trigger he did not know whether or not there was a bullet in the firing chamber. In his taped statement Dixon said, "I was scared at first—I didn't want to do it." He also said that he pointed the gun at her and fired. Thus, there is evidence that he fired on impulse rather than following deliberation.

We agree there is substantial evidence, as pointed out by the State and discussed above, that tends to show Dixon's guilt of the greater offense. The issue is not whether the evidence is strong but whether Dixon might reasonably have been convicted of the lesser offense of attempted second-degree murder, the attempt intentionally to kill Bell without premeditation or deliberation. As we said in *State v. Cummings*, 242 Kan. 84, 91, 744 P.2d 858 (1987), the evidence need not be strong but may be weak and based solely on the defendant's testimony. We conclude there was sufficient evidence to require an instruction on attempted second-degree murder.

With regard to the lesser included offense of attempted voluntary manslaughter, Dixon contends that an instruction was required because there was evidence on which a reasonable jury might have convicted him of attempting to kill Bell in the heat of passion. He relies on *State v. Hill*, 242 Kan. 68, 74-75, 744 P.2d 1228 (1987).

K.S.A. 21-3403 defines voluntary manslaughter as the "unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion." The elements of voluntary manslaughter are as follows: (1) The defendant killed the victim, (2) intentionally, and (3) in the heat of passion. PIK Crim. 2d 56.05. "Heat of passion" means "any intense or vehement emotional excitement which was spontaneously provoked from circumstances." PIK Crim. 2d 56.04(e) (citing *State v. McDermott*, 202 Kan. 399, 449 P.2d 545, *cert. denied* 396 U.S. 912 [1969]).

The State relies on *State v. Guebara* for the following discussion of heat of passion and the standard for provocation:

"(2) 'Heat of passion' means any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger,

hatred, furious resentment, fright, or terror. Such emotional state of mind must be of such a degree as would cause an ordinary man to act on impulse without reflection. [Citations omitted.]

"(3) In order to reduce a homicide from murder to voluntary manslaughter, there must be provocation, and such provocation must be recognized by the law as adequate. A provocation is adequate if it is calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason. 2 Wharton's Criminal Law § 155 [Torcia 14th ed. 1979]. In order for a defendant to be entitled to a reduced charge because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting *sufficient provocation.* [Citations omitted.]

"(4) The test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be 'sudden quarrel' or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and his reason. [Citations omitted.] In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant. The fact that his intelligence is not high and his passion is easily aroused will not be considered in this connection. [Citation omitted.]

"(5) Mere words or gestures, however insulting, do not constitute adequate provocation, but insulting words when accompanied by other conduct, such as assault, may be considered. 2 Wharton's Criminal Law § 156. In *State v. Buffington,* 71 Kan. 804, 81 Pac. 465 (1905), it was held that the trial court properly instructed the jury that no words, however abusive and insulting, will justify an assault or will justify a sufficient provocation to reduce to manslaughter what otherwise would be murder. See also *State v. Hardisty,* 121 Kan. 576, 249 Pac. 617 (1926)." 236 Kan. at 796-97.

See *State v. Hill,* 242 Kan. at 74.

In light of these principles, Dixon's contention that the "evidence of abusive and insulting language by Ms. Bell to Mr. Dixon was sufficient to require the lower court to instruct the jury on attempted voluntary manslaughter" must be rejected. Bell's words did not justify an assault, and she did not threaten Dixon's physical safety.

Next, we consider defendant's argument that the district court's instruction on the manner by which the jury was to consider the alternative charges of attempted murder and aggravated battery was clearly erroneous. In count one of the complaint/information, Dixon was charged with attempted first-degree murder. Count two, aggravated battery, was charged *in the alternative* to count one.

Dixon complains that Instruction No. 8 prevented the jurors from even considering whether or not the evidence established his guilt of the aggravated battery charge. The instruction stated the following:

"Elbert C. Dixon is charged in Count One and Count Two in the alternative. In Count One, Mr. Dixon is charged with attempted first degree murder. In Count Two, Mr. Dixon is charged with aggravated battery. Mr. Dixon pleads not guilty to both charges.

"You should first consider if Mr. Dixon is guilty of attempted first degree murder. If you find Mr. Dixon guilty of that charge, you should so indicate on the verdict form and you need not consider if Mr. Dixon is guilty of aggravated battery.

"If you do not agree that Mr. Dixon is guilty of attempted first degree murder, you should then consider if he is guilty of aggravated battery. If you find Mr. Dixon is guilty of that charge, you should so indicate on the verdict form.

"If you find Mr. Dixon is not guilty of either charge, you should so indicate on the verdict form."

Dixon concedes that trial counsel raised no objection to the instruction. Thus, this court looks to see whether the instruction is clearly erroneous. *State v. DeHerrera*, 251 Kan. 143, Syl. ¶ 2, 834 P.2d 918 (1992). This standard is met "only if the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict." 251 Kan. 143, Syl. ¶ 2.

Dixon argues that Instruction No. 8 caused the jury to consider aggravated battery as a lesser included offense of attempted first-degree murder rather than as an alternative charge. That is, the instruction directed the jurors to consider the greater charge first and, if they found that it had been proved, to disregard the lesser charge.

Aggravated battery is not a lesser included offense of attempted murder. *State v. Daniels*, 223 Kan. 266, Syl. ¶ 3. It should also be noted that Dixon could not be convicted of both attempted murder and aggravated battery. In *State v. Turbeville*, 235 Kan. 993, 995, 686 P.2d 138 (1984), attempted murder and aggravated battery convictions arising out of the same overt act were said to be "clearly multiplicitous."

On this issue, the State simply asserts that the alternative charges reflected each party's theory of the case and the jury accepted the prosecution's theory.

Neither party cites any governing, or even helpful, authority.

A variation of this issue arose in the recently decided case of *State v. DeHerrera*, 251 Kan. at 146-47. DeHerrera stabbed his wife five times, but did not kill her. Like Dixon, DeHerrera was charged with attempted first-degree murder or in the alternative with aggravated battery. The jury which convicted DeHerrera was instructed on these two offenses as well as attempted second-degree murder as a lesser included offense of attempted first-degree murder.

The instruction as to how the jurors were to proceed with their deliberations, referred to by this court as an "ordering instruction," stated the following:

" 'The order in which you should consider the charges is as follows:

'You should first consider whether or not defendant is guilty of Attempted Murder in the First Degree.

'If you find defendant is not guilty of this offense, you should consider whether or not defendant is guilty of Attempted Murder in the Second Degree.

'Alternatively you should consider whether or not defendant is guilty of Aggravated Battery.

'If you do not find defendant guilty of either Attempted Murder in the Second Degree or Aggravated Battery, you should then consider whether or not defendant is guilty of Attempted Voluntary Manslaughter.

'When there is no reasonable doubt defendant is guilty of an offense and there is a reasonable doubt as to which of two or more offenses a defendant is guilty, the defendant may be convicted of the lesser offense only.' " 251 Kan. at 146-47.

DeHerrera's theory of the evidence was that he wanted to hurt but not kill his wife. He argued that the ordering instruction caused the jury not to consider his theory of the evidence because it appears from the instruction that aggravated battery is in the alternative only to attempted second-degree murder. This court rejected the argument as follows:

"The jury was instructed to first consider whether DeHerrera was guilty of attempted first-degree murder. The jury came to the conclusion DeHerrera was in fact guilty of attempted first-degree murder and, thus, it was unnecessary for the jury to consider whether the defendant was guilty of the lesser included offenses or the alternative charge of aggravated battery. Hence, the ordering of the lesser included offenses with respect to the alternative charge of aggravated battery is irrelevant. Any possible error in the instruction is harmless." 251 Kan. at 147.

The assumption underlying the proposition is that, where there is evidence to support a finding of guilt of the greater offense, the defendant must be convicted of the greater offense irrespective of the jurors' decision on any alternative charge. A defendant charged with more than one offense in a multiple-count complaint may be convicted of more than one offense. In contrast where, as here, the defendant has been charged in the alternative, he may be convicted of only one offense. Thus, the multiple-count instruction, PIK Crim. 2d 68.07, is not appropriate where the defendant has been charged in the alternative.

In the lesser included offense instruction the jury is directed to consider the offenses in descending order of severity because the greater (or greatest) offense is the one with which defendant has been charged. If the evidence, principally the State's evidence, establishes beyond a reasonable doubt the defendant's guilt of the charged offense, the case is over.

This is the rationale and conclusion we reached in *DeHerrera*. In *Turbeville*, too, this court assumed that the defendant should be convicted of the greater offense where the evidence supported each of the alternate charges. Turbeville was convicted of attempted murder and aggravated battery. This court concluded that the convictions were multiplicitous, and the remedy was the setting aside of the conviction and sentence on the aggravated battery charge. 235 Kan. at 995.

Where, as in the present case and in *DeHerrera*, the charges were submitted to the jury in the alternative, the jurors considered and decided which, if either, charge the defendant should be convicted of. However, logic dictates that where, as here, the alternative charges are based on a single act, and therefore multiplicitous, the jury need not consider the lesser alternative charge of aggravated battery if it finds the defendant guilty of attempted first-degree murder.

The conclusion reached in *DeHerrera* is controlling in the present case. It was unnecessary for the jury to consider the alternative charge upon deciding that Dixon was guilty of attempted first-degree murder. We find no error in the instruction.

Finally, we consider if the district court erred in failing to suppress Dixon's taped statement. Dixon does not argue that he

was ignorant of his right to remain silent or that he did not understand that he had the right to remain silent. Nor does he allege that his smoking cocaine an hour before the shooting impaired his ability to understand the rights of which he was advised.

What Dixon appears to be arguing is that his taped statement should have been suppressed because his declining to undergo interrogation when he first was taken into custody precluded any subsequent interrogation. Officer Fortune testified at the suppression hearing that he advised Dixon of his *Miranda* rights when he was taken into custody. Then, when Officer Fortune asked Dixon whether he wanted to talk about the incident, Dixon declined. Fortune's testimony was that Dixon stated that he did not know because he was "kind of messed up in the head" right then.

At that time Dixon was asked no questions about the shooting. Detective James was contacted. Upon her arrival, she was informed that Officer Fortune had advised Dixon of his *Miranda* rights. Custody of Dixon was turned over to her for transportation to the police department.

Detective James did not ask Dixon any questions during the drive. Dixon broke the silence by stating "that he really had messed up, he didn't understand what all was going on but that he had a lot of problems in his life." Dixon told Detective James that "he had a bad cocaine habit and his dad is Cain Dixon and they didn't know why they did this to women but he really needed some help."

At the police department, as James walked Dixon to the elevators Dixon asked if Bell was going to be all right. James responded that she did not know what Bell's condition was. Dixon said that he wanted to be kept posted.

In the elevator Dixon said to James, "I didn't mean to kill her, we were arguing, I had been through a lot with her and a lot of things have messed up." Dixon also volunteered to James that Bell had "messed up" his new car, that he had been through a lot with her, that she had given birth to a child that he had not fathered, and that she had miscarried when she was pregnant with his baby.

Detective James placed Dixon in an interview room, handcuffed him to the table, and went out to obtain information about the incident. Upon returning, she turned on a tape recorder. Because Dixon had stated that he had a drug problem, James began with a medical questionnaire for the purpose of determining whether his ability to understand the *Miranda* warning was impaired.

After completing the questions on the medical and personal information sheets, Detective James read the *Miranda* rights to Dixon and he signed the rights form. On the form Dixon checked and initialed the affirmative response to the question, "Having these rights in mind do you wish to talk to us now?" Then Dixon answered James' questions about the shooting and the surrounding circumstances.

Dixon cites *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975), in support of his argument. After being arrested in connection with some recent robberies and advised of his *Miranda* rights, Mosley said he did not want to answer questions. Interrogation immediately ceased, and Mosley was taken to a cell. He had not asked to consult with a lawyer. Several hours later another officer took Mosley to the office of the homicide bureau for questioning about an unrelated murder. Mosley again was advised of his *Miranda* rights. Mosley then made a statement implicating himself in the murder. The procedures followed in each of the interrogation sessions fully comply with *Miranda* requirements. The issue was whether, in these circumstances, resumption of the questioning was permissible.

The United States Supreme Court concluded that it was permissible. The key to the decision was that Mosley's " 'right to cut off questioning' was fully respected." 423 U.S. at 104.

Dixon contrasts his questioning with that of Mosley. He asserts that "Detective James did nothing but attempt to persuade Mr. Dixon to reconsider his decision not to talk about the incident. She never acknowledged his prior refusal, and totally ignored his decision to exercise his Fifth Amendment privilege." We do not agree.

In the present case, after initially saying that he did not really want to talk, Dixon became quite talkative without any encouragement from the officer who was with him. Before he was asked a single question by Detective James, he volunteered substantial

and significant information implicating himself in the shooting. James respected Dixon's right to cut off questioning; Dixon, however, demonstrated his desire to discuss the incident by making voluntary statements.

The State urges that the United States Supreme Court's rejection of the concept of a permanent or blanket immunity from interrogation once a defendant has invoked his privilege also is the longstanding rule in Kansas. In *State v. Law*, 214 Kan. 643, 522 P.2d 320 (1974), defendant was arrested while running from the scene of a burglary. He refused to be questioned at that time. Later, after being taken to the jail, booked, and spending several hours in a cell, defendant was advised of his *Miranda* rights and waived them. This court concluded that incriminating statements he gave after waiving his rights were admissible. 214 Kan. at 649-50.

The standard of review of a district court's determination where an inquiry on the admissibility of a defendant's statement was conducted and the statement was admitted into evidence is narrow. This court will accept the district court's determination if it is supported by substantial competent evidence. 214 Kan. 643, Syl. ¶ 1.

The record in the present case shows that, after initially declining to talk, Dixon initiated a discussion with Detective James. Without encouragement, Dixon demonstrated his willingness to discuss the shooting. When he was advised a second time of his *Miranda* rights, he waived them. The district court's ruling is supported by substantial competent evidence. We find no error in the district court's failure to suppress the defendant's statement.

The other issues raised by the defendant on appeal need not be addressed due to the reversal of the defendant's conviction.

The judgment of the district court is reversed, and the case is remanded for a new trial.

HERD, J., dissenting: A person is presumed to intend the logical consequences of his or her acts. *State v. Gander*, 220 Kan. 88, 90, 551 P.2d 797 (1976). Dixon was angry at Bell and jealous of her perceived association with another man. After consuming cocaine, he went to a distant location and obtained his .38 re-

volver, proceeded to the house where Bell was, shot her in the chin, and stated: "If I can't have you, can't nobody else have you." Defendant's actions speak louder than his later contrived words that he intended only to scare Bell. The logical consequences of Dixon's angrily going for his loaded gun and pointing it at Bell was a shooting, willfully and with premeditation. I find no credible evidence of attempted murder in the second degree. I would affirm the trial court.