No. 47,638

STATE OF KANSAS, *Appellee*, v. RICHARD WARDELL BROWN, JR., *Appellant.*

(538 P. 2d 631)

Opinion filed July 17, 1975.

*Robert M. Brown*, of Topeka, argued the cause and was on the brief for the appellant.

*Gene M. Olander*, District Attorney, argued the cause, and *Curt T. Schneider*, Attorney General, was with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Defendant-appellant (Richard Wardell Brown, Jr.) appeals from a conviction by a jury of aggravated burglary as defined by K. S. A. 21-3716. Defendant was acquitted on a count of murder in the first degree. The case arises out of an incident in Topeka wherein on August 21, 1973, one Mary Fortney was murdered at her home.

The evidence reproduced in the record on appeal consists, for the most part, of testimony given by Assistant District Attorney, Larry McClain, concerning statements made to him by defendant. McClain testified at length at the hearing on defendant's motion to suppress and again at trial. The defendant testified in his own behalf on the motion to suppress and at trial. Defendant's testimony concerning statements made to McClain conflicted to a considerable extent with testimony given by McClain.

Investigation of the case was conducted by the Capitol Area Major Case Squad, an organization of area law enforcement officers which is called upon to investigate more serious crimes committed in Topeka and vicinity. Apparently, the Capitol Area Major Case Squad had received information that defendant had talked to some other person about the Fortney case. On August 28, 1973, defendant was interviewed by Detective Marvin Vaughn of the Topeka Police Department and two other members of the Capitol Area Major Case Squad. Defendant was advised of his rights under *Miranda,* but refused to talk beyond denying any knowledge of the Fortney killing. Defendant was confronted with a statement concerning the Fortney killing, which he had allegedly made to some other party. Defendant continued to deny any knowledge of the incident, but subsequently asked the officers if he could get immunity. The officers advised defendant that they were not authorized to grant immunity, but that they would contact an assistant district attorney who had such authority.

A short time later, Mr. McClain arrived to interview defendant. McClain testified that he first inquired of defendant whether he had been advised of and understood his rights. McClain further testified that, at the beginning of the interview, he told defendant there would be no immunity and no promises of any kind. Initially, defendant denied any complicity in the Fortney killing. While these denials were taking place, McClain asked defendant who had tied up Mrs. Fortney, and defendant replied that Terry Burr had done so, and then defendant proceeded to tell McClain in detail what had happened at the Fortney house. According to McClain, defendant's story was that he had been at a party with Terry Burr; that they had stopped by Jeff Sanders's residence and from there the three went to the Fortney house; that he entered the Fortney house, which was dark at the time, through a back window, which could only be raised about twelve inches; that he unlocked the front door; and that Terry Burr and Jeff Sanders entered, after

which defendant left the house. McClain's testimony of defendant's story, after defendant left the house, is narrated as follows:

"He did say that he heard the woman scream, and when he heard the woman scream, he, being Richard Brown, that he was outside the house and he went back into the house and tried to get Terry off the woman. He said that they were on the floor in the front or middle room, is what he described as the location of the house. He said when he went back in, that Terry Burr was on top of this woman and that he was beating her. He said, Richard Brown again—pardon me for using the pronoun. Richard Brown said he tried to pull Terry off, but he couldn't pull him off so he left.

"He said that at the time he left, this second time he left the house, that Jeff was in the house—and this is Jeff Sanders. He said he saw Jeff in the house and he was in the kitchen of the house at the time he saw him. He also said that Jeff tried to help pull Terry off.

"He indicated that when he left, when Richard Brown left the house on the second time, that he left and went to his home at 801 Highland.

"The witness further related that subsequently the appellant told him he had not seen or heard a cat and further stated appellant had said that Terry Burr had tied up the decedent with a clothes hanger and that Terry later told him that he had 'got down on her' meaning that he raped her."

According to McClain, the defendant, at McClain's suggestion, repeated the story several times; that there were some contradictions, but that the general story was consistent each time it was related. On cross-examination McClain admitted that defendant was confused in his answers to specific questions about the interior of the Fortney house and where some items of furniture were located. McClain also testified that several times during the interview that defendant declared that he had never lied so good in his life.

Following the McClain interview, defendant was taken to the Fortney house and asked to reconstruct the crime for McClain and the investigating officers. McClain further testified that after defendant was brought back from the Fortney house, he informed defendant that he would talk to the district attorney about charging defendant with something less than first degree murder if defendant would sign a statement and agree to testify against Sanders and Burr. The upshot was that defendant was charged with aggravated burglary and was permitted to post a nominal bond. Defendant was called as a state witness at the preliminary hearing for Sanders and Burr, but refused to testify on the ground that his testimony might incriminate him. Thereafter, defendant was charged with murder in the first degree along with aggravated burglary.

At trial the state established the corpus delicti by the testimony

of investigating officers. The officers described the body of Mrs. Fortney, she was lying on a bed on her back with an elastic type bandage wrapped around her head and neck area; that she was clad only in an undershirt; that her arms were behind her back; and that her face and stomach were extremely bruised. A pathologist, called by the state, testified that there was "hemorrhaging in the vagina wall," indicating that a rape had been committed. The investigating officers observed an iron skillet on the stove in the kitchen and that the screen on a back window had been torn across the bottom and up one side.

The defendant took the stand at trial and denied any complicity in the killing. He testified that when he was arrested and interviewed he was under the influence of drugs; that he had been smoking and taking acid. In general, he testified that he had fabricated the story which he told from bits of information which he had gathered from the officers. He further testified that he thought McClain had come to help him; that McClain had told him that if he did not confess in five minutes "he was going up the river." In his testimony on rebuttal, McClain emphatically denied that he had made such a statement to defendant.

Defendant filed a motion to suppress his written statement and oral statements given by him to McClain. The testimony given by defendant and McClain on the motion to suppress was essentially the same as that given at trial. The trial court ruled that the written statement was induced by a promise and was, therefore, inadmissible, but that the oral statements given to McClain were not the result of any promise or inducement, had not been tainted, and were, therefore, admissible.

The defendant specifies four points of error on appeal. In his first point defendant claims the trial court erred in overruling his motion to discharge for failure to bring him to trial within ninety days after arraignment under K. S. A. 22-3402. This point may be summarily disposed of. Defendant was arraigned on December 7, 1973, and his case was set for trial on February 4, 1974, when defendant made application for a continuance in order to hire a private investigator to assist defendant in the defense of his case. The case was reset for April 1, 1974, when the trial commenced. Since the delay was obviously the result of his own application, defendant is foreclosed from relief by the provisions of the statute itself. (See, also, *State v. Pendergrass,* 215 Kan. 806, 528 P. 2d

1190; *State v. Powell,* 215 Kan. 624, 527 P. 2d 1063; and *State v. Welch,* 212 Kan. 180, 509 P. 2d 1125.)

Defendant next contends that the admission into evidence, over his objection, of the skillet found in the victim's house was error. McClain testified that defendant stated that he had seen Mary Fortney hit her assailant with a skillet. The investigating officers found an iron skillet on the stove in the kitchen. Defendant takes the position that since the skillet was discovered in the kitchen— a room away from the living room where the victim's body was found—that it had no connection with the case and was irrelevant. The state, on the other hand, says that any discrepancies as to where the skillet was found and where it was allegedly used bears only on the weight to be given it as evidence rather than on its admissibility.

Our statute, K. S. A. 1974 Supp. 60-401, sets forth the following definitions:

"(*a*) 'Evidence' is the means from which inferences may be drawn as a basis of proof in duly constituted judicial or fact-finding tribunals, and includes testimony in the form of opinion, and hearsay.

"(*b*) 'Relevant evidence' means evidence having any tendency in reason to prove any material fact."

Admissibility of evidence is largely within the discretion of the trial judge, subject to exclusionary rules. (*Williams v. Union Pacific Railroad Co.,* 204 Kan. 772, 465 P. 2d 975.) Defendant does not point to any specific exclusionary rule—his argument is simply that the skillet was irrelevant.

In discussing relevancy, we have frequently said that to be admissible in the trial of a case evidence must be confined to the issues, but it need not bear directly upon them. To render evidence of collateral facts competent, there must be some natural, necessary or logical connection between them and the inference or result which they are designed to establish. (*State v. Fagan,* 213 Kan. 587, 518 P. 2d 552; *State v. Gauger,* 200 Kan. 563, 438 P. 2d 463; and *In re Estate of Isom,* 193 Kan. 357, 394 P. 2d 21.)

In the case at bar the trial court was confronted with two questions with respect to the admissibility of oral statements made by defendant to McClain—(1) were such statements induced by promises of immunity or by coercion; and (2) was the trustworthiness of defendant's statements sufficiently established. As we have previously noted, the defendant, early in the course of his interrogation, said that he had seen the victim strike her assailant with a

skillet. In subsequent repudiation of his statements defendant claimed that he had not been in the Fortney house prior to being taken there by the officers. Since a skillet was mentioned by defendant in his statement we think the presence of a skillet may be said to be logically connected with the establishment of defendant's presence in the Fortney house. Tested by the rules heretofore stated, we believe the skillet was relevant on the issue of the trustworthiness of defendant's statements and tended to corroborate admissions made by him. Any evidence tending to establish defendant's presence was relevant on the issue of defendant's participation in both the crimes charged. We agree with the state that any discrepancies between where the skillet was found and where it was allegedly used bears on the weight to be given to the skillet as evidence, rather than on its admissibility. We find no abuse of discretion in the admission of the skillet into evidence.

For his third point defendant contends the trial court erred in overruling his motion to suppress as evidence at the trial of his case his purported confession and admissions given to McClain because they were obtained by hope and reward of leniency, and for the further reason that his admissions were not trustworthy.

As we have previously noted, the trial court did sustain defendant's motion in part, suppressing the written statement because it was induced by a promise of leniency, but, on the other hand, ruling that the oral statements of defendant testified to by McClain had not been tainted, were voluntarily made and thus were admissible. Hence, we are only concerned with the admissibility of defendant's oral statements made to McClain.

The state contends that all of defendant's statements to McClain were made prior to any promise of leniency or immunity. The state says that no promises or inducements were made until the subject of a written statement came up, which was after defendant had repeated his account of the happenings at the Fortney house two or three times, and it was only in connection with the signing of the written statement and defendant's agreement to testify against Burr and Sanders that the qualified immunity was promised. At the hearing on defendant's motion to suppress, the trial court was called upon to evaluate the conflicting testimony of McClain and defendant as to what was said and when and under what circumstances it was said; and then to make a decision in accordance with what the court perceived to be the truth. (*Holt v. State*, 202 Kan.

759, 451 P. 2d 221.) The court, on defendant's motion to suppress, as did the jury at trial, chose to believe McClain.

The rule adopted by this court under which the admissibility of an extrajudicial statement is tested on preliminary inquiry by the court is set forth in *State v. Creekmore,* 208 Kan. 933, 495 P. 2d 96, wherein we held:

"When the trial court conducts a full preliminary inquiry on the admissibility of an extrajudicial statement given by an accused, determines the statement was freely, voluntarily and intelligently given and admits the statement into evidence at the trial, this court on appeal should accept that determination if it is supported by substantial competent evidence." (Syl. ¶ 2.)

Our decision in *Creekmore* was followed by the more recent case of *State v. Colin,* 214 Kan. 193, 519 P. 2d 629. In cases such as this, where there is a genuine conflict of evidence in connection with the voluntariness of a statement, great reliance must be placed upon the finder of fact. (*Holt v. State,* supra; and *Andrews v. Hand,* 190 Kan. 109, 372 P. 2d 559.)

The ruling of the trial court on the motion to suppress and on the admission of McClain's testimony at trial is substantially supported by the record. In this connection McClain testified at the motion to suppress concerning his interview with defendant as follows:

"Q. Could you tell us the conversation, what took place then after, at that point in time?

"A. Well, to start with, I asked Richard Brown if he had been advised of his rights and if he understood what those rights were or had any questions about his rights. He indicated that he understood his rights; that the officers had given him his rights; he understood them, and that he didn't have any questions about them.

"I talked with him real briefly about whether or not he had been using any alcohol or any other drugs in the last 24 hours. He indicated that he had not used either drugs or alcohol.

"And he indicated that he wanted to talk to me, and I asked him if he understood that he would be giving up the rights the officers had told him about if he went ahead and talked to me.

"Q. What did he indicate to you?

"A. He said he wanted to talk to me.

"Q. All right. Was there any discussion about immunity or anything of that nature?

"A. Yes, I told him before we got into any conversations at all, that I— it was my understanding that he was asking for some kind of immunity, and I wanted to make it absolutely clear to him that there would be no immunity; that I could make no promises to him at all; and if he wanted to talk to me, it would have to be with his understanding that there would be no promises, no immunity of any kind.

"Q. And you indicated that to him before you started talking to him?

"A. Yes, I did.

"Q. And did you state that in clear and emphatic terms?

"A. Yes, and went over it about three times. I am sure—well, I know I told him a minimum of three times there would be no immunity, no promises of any kind."

On cross-examination by defendant's counsel at trial, McClain testified:

"Q. But you did lead him to believe, didn't you, Mr. McClain, that sometime in your negotiations with him, he would be given some kind of immunity, didn't you?

"A. After, sir, he had told me the story about three or four times, there was a discussion about him testifying in return for being charged only with burglary as opposed to murder. There was no discussion about him being charged with anything less than murder until after he had already told the story."

The reliability or trustworthiness of defendant's statements to McClain was, like the question of voluntariness, a matter to be considered by the trial court on the motion to suppress and by the jury at trial. The testimony of McClain, taken as true as it apparently was by the court and jury, is sufficient to support the trial court's ruling and the jury's verdict.

The defendant cites recognized authorities to the effect that a positive promise of benefit resulting in the making of a confession renders it involuntary. We agree with the proposition and it was undoubtedly the basis for the trial court's suppression of defendant's written statement which was executed in response to McClain's promise of qualified immunity. However, the trial court and the jury believed McClain's testimony that defendant had related his story three or four times after being informed that there would be no immunity nor promises of leniency, and that no promise of leniency came into the discussion until the giving of a written statement was mentioned. The circumstances surrounding defendant's oral statements to McClain distinguished this case from cases such as *State v. Stuart*, 206 Kan. 11, 476 P. 2d 975, in which promises or threats are made in the first instance in order to secure admissions or a confession.

Defendant's final point is that the verdict was contrary to the evidence. True, the verdict was contrary to defendant's testimony, but the jury chose to believe the testimony of McClain rather than that of defendant. The applicable general rule governing appellate

review was most recently stated in *State v. Ritson*, 215 Kan. 742, 529 P. 2d 90, wherein we held:

"In a criminal case, the issue on appeal is not whether the evidence establishes guilt beyond a reasonable doubt, but whether the evidence is sufficient to form the basis for a reasonable inference of guilt when viewed in the light most favorable to the state."   (Syl. ¶ 1.)

For the reasons set forth above the judgment of the trial court is affirmed.

FROMME, J., not participating.