No. 75,022

STATE OF KANSAS, *Appellee*, v. KALEAFA STRAUGHTER, *Appellant*.

932 P.2d 387

Opinion filed January 24, 1997.

*Jean K. Gilles Phillips*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Kaleafa Straughter appeals his jury trial convictions for felony murder, an off-grid felony, K.S.A. 21-3401(b), aggravated robbery, K.S.A. 21-3427, and aggravated burglary, K.S.A. 21-3716, all stemming from the stabbing death of William O. Brown III. Our jurisdiction is under K.S.A. 22-3601(b)(1) (an off-grid crime conviction).

The issues are whether the district court erred in: (1) admitting Straughter's statements to police, thus violating his Fifth Amendment rights; and (2) allowing the State to present evidence that Straughter initially invoked his right to remain silent when the police questioned him about an unrelated incident.

Straughter's additional claim that the district court erred in refusing to instruct the jury on abandonment or withdrawal from the underlying felony as a defense to felony murder is resolved by our recent holding in *State v. Kaiser*, 260 Kan. 235, 249, 918 P.2d 629 (1996) (The Kansas Legislature has not enacted a defense of withdrawal from aiding and abetting. There was no error in refusing to instruct on withdrawal as a defense.). Straughter also asserts error in the district court's refusing to give the PIK Crim. 3d 54.06 jury instruction on foreseeability.

We find no error and affirm.

## FACTS

Straughter was 18 years old at the time of the crimes and lived with his mother and her boyfriend. Tyron Porter and Lance Stephens lived at the same apartment complex and were 15 or 16 years old. Brown, the victim, age 44, lived at a mobile home park separated from the apartment complex by a privacy fence and wooded area.

Straughter, in his taped confession to the police on December 1 and 2, 1994, described the events. His statement is summarized:

Straughter went outside his apartment around 7 p.m. on November 16, 1994. Porter and Stephens told him that they had talked to an "old dude" earlier in the day who had some "straps" (guns) including a .38 pistol and some rifles. They wanted Straughter to help them get the guns because Straughter was "aggressive." Straughter was interested in the .38 and agreed to help them. Porter had a silver-colored pellet pistol that resembled a 9 mm pistol, a plastic trash bag, and a spray can of tear gas. Derrick Hanna, a first cousin of Porter's, was also there.

The four entered Brown's mobile home as he was watching television. While Porter and Stephens attempted to subdue Brown with the pellet pistol and trash bag, Straughter sprayed tear gas and, with Hanna, searched the back bedroom. Straughter was only interested in taking guns. He did not recall seeing or touching a license plate in the bedroom, but said that he might have. When he and Hanna came out of the second bedroom, Brown had Stephens pinned against the south wall and Porter was "out of the

picture." Hanna and Straughter then dove on Brown, or "bumped" him. Brown fell on the carpet. Straughter fell on Brown's back. Stephens hit Brown with a chair and was kicking him in the face. Straughter said, "Let's get out of here," "He hasn't got anything," or words to that effect, and was the first one to leave the mobile home. As Straughter was leaving, he saw Porter pick up a broken piece of an ash tray and start stabbing Brown in the side as Brown attempted to get up. Straughter also saw Stephens approaching Brown with a hunting knife that Stephens had taken from the kitchen area. Although Straughter at times claimed he left before seeing Stephens stab Brown, he at one point described seeing Stephens stabbing Brown with the hunting knife in the side after Porter had stabbed Brown. Straughter saw a VCR in the mobile home and, although first denying it, admitted seeing Porter take the VCR.

On December 1, 1994, at approximately noon, Detective Michael Hennessy arrested Straughter. There was an outstanding juvenile warrant on Straughter for auto theft. Also, fingerprints on the pellet pistol and license plate found in Brown's mobile home had been identified as Straughter's. Hennessy told Straughter that he was being arrested on the auto theft warrant. Straughter was placed in an interview room at 12:15 p.m. Hennessy and Detective Chisholm were in the room with Straughter. Straughter was given a personal information sheet, which he did not complete beyond name, address, and date of birth. He was belligerent. Hennessy gave Straughter the written *Miranda* warnings and asked him to read the form. Hennessy was going to talk to Straughter about the auto theft. Straughter stated he knew his rights. Straughter initialed the form, showing that he had read and understood his rights and that he did not want to talk to the police. Hennessy signed and dated the form "12:38 p.m." Hennessy testified at the suppression hearing that he then told Straughter "that was his right, he didn't need to talk to us about this auto theft case or a homicide case that we're currently investigating." Straughter asked, "[W]hat homicide?" Hennessy told Straughter he was investigating a homicide in a mobile home park near Straughter's neighborhood. Straughter responded that he did not know what Hennessy was talking about, but he would talk about the homicide. Hennessy asked Straughter

if he was changing his mind about talking, and Straughter said that he did not want to talk about the auto theft case, but he would talk about the homicide. Hennessy gave Straughter another *Miranda* warnings form and asked him to read it aloud and sign it. Straughter complied, signing the form with his left hand because his right hand was cuffed to the table. Hennessy signed the form as completed at 12:45 p.m. The form stated that Straughter now wished to talk to the police.

Hennessy told Straughter that fingerprints found at the crime scene had been identified as Straughter's. Straughter adamantly denied they were his and said that Hennessy was making it up. Straughter said he had not been to the mobile home park in question for 2 years. Hennessy asked Straughter if he had ever handled a gun, and Straughter said he had not. Hennessy asked Straughter about the pellet gun and the fingerprint on it. Straughter gave no explanation about why his fingerprint was on the pellet gun. Hennessy and Chisholm left the room at 1:15 p.m. Shortly after 2 p.m., they returned to obtain a search waiver from Straughter for his apartment and to take custody of his tennis shoes.

Hennessy visited Straughter's apartment. He told Straughter's mother and her boyfriend that her son was a suspect in the homicide and that the son's fingerprints were found at the crime scene. Hennessy denied saying anything to them about charges being filed against Straughter. The mother testified at the suppression hearing that Hennessy told her, "[W]e know Kaleafa did not do this, but we know that he knows who did. We think he's afraid to tell us." Also, Hennessy informed the mother that if Kaleafa "didn't speak, then they would probably have to charge him with the crime." The boyfriend's testimony was similar to the mother's testimony. The mother and her boyfriend visited Straughter in the interview room that same afternoon, after talking to Hennessy.

Hennessy and Chisholm recontacted Straughter at 5:40 p.m. to continue the interview. Straughter said he did not remember touching the pellet gun, but he identified the owner as Tyron Porter. Then, Straughter said he did remember touching the gun in late October or early November. He also said that he heard from Stephens and Porter that they had gone into the mobile home to

get guns and wound up stabbing the owner. As the questioning continued, Straughter said that he was at the mobile home park, but just went up to the door, saw the "old dude," backed away, and left. When Hennessy questioned Straughter again about the fingerprints on the gun and on the license plate, Straughter admitted that he entered the mobile home and searched it, hoping to find a .38, but denied any contact with Brown.

Straughter initially refused to allow the interview to be taped. However, at 6:47 p.m., he agreed, and the interview continued until 7:57 p.m., when Straughter was transported to a detention facility and fed. Hennessy contacted Straughter the next morning, December 2, at the county courthouse and presented another *Miranda* warning form. Straughter read the form aloud and signed it, stating that he understood his rights and was willing to talk to the police. Straughter provided information on the location of the hunting knife and on the source of the shoelace found in the mobile home. Hennessy and an investigator returned to the apartment complex. They searched Porter's bedroom, finding a pair of rollerblades with a missing lace and a black glove. The lace found in the mobile home appeared to match the rollerblade with the missing lace, and the black glove found in Porter's bedroom appeared to match the one found at the mobile home. Chisholm found the knife handle and Hennessy found the knife blade in a nearby wooded area, guided by Straughter's directions. The handle had Brown's initials on it. The knife blade and handle were admitted into evidence. The tapes of the interviews were admitted into evidence and played for the jury.

On December 3, 1994, Hennessy contacted Straughter again and questioned him about the involvement of Derrick Hanna. Straughter said that Hanna was not involved; it was only Stephens, Porter, and himself.

Straughter moved to suppress his statements to police, contending they were involuntary, the questioning after he initially stated he did not want to talk was improper, and he had been promised leniency by the police in exchange for his cooperation. The motion was denied.

Straughter also filed a motion in limine to preclude the State from mentioning the prior arrest for another crime, or any other criminal matter. The district court ruled that there would be no reference to the charge of auto theft, but the State would be allowed to refer to the fact that Straughter had invoked his *Miranda* rights after his arrest for auto theft without referring to the charge itself.

## DISCUSSION

### Straughter's Statements to Police

At the suppression hearing, when asked what he meant when he signed "no" on the first *Miranda* form, Straughter testified: "I wasn't talking until I had seen an attorney. I wanted to see an attorney. That was the first thing I told them when he mentioned a homicide." When asked whether the officer said anything about getting him an attorney, Straughter testified, "No." Straughter also testified that he was in the interview room for 8 hours on December 1, 1994, without being given anything to eat, although he did have a Pepsi.

Straughter was cross-examined on the first *Miranda* form that Hennessy presented to him at the beginning of the interview:

"Q. You did tell Detective Hennessy you knew what your rights were anyway, so you didn't need to read it out loud or have it read to you?

"A. No, I didn't say anything. I read it to myself, and I answered no because I wasn't talking to him."

Straughter denied that he had ever seen or signed the second *Miranda* form the police presented him on December 1, 1994. He admitted signing another *Miranda* form on December 2, 1994, indicating that he was willing to talk to the police. Straughter was asked about that form:

"Q. On December 2nd . . .. Your Rights form, why did you say or why did you mark yes, you would speak with the detectives if you are saying that your desire all along was to have an attorney?

"A. He told me I wouldn't be charged with the murder if I told him what happened.

"Q. You keep on saying 'he.' Who's 'he?'

"A. Oh, Detective Hennessy."

Straughter also testified that when his mother came to visit him in the interview room on the afternoon of December 1, 1994, she told him she was going to get an attorney for him, and that made him feel good. When asked why that made him feel good, Straughter responded: "Because I don't have to talk to anyone. I know I'll be all right until I speak with an attorney."

Hennessy did not testify that Straughter ever requested an attorney during the questioning. During direct examination, the State did not specifically ask Hennessy whether Straughter requested an attorney.

Straughter's counsel did not ask Hennessy during cross-examination whether Straughter ever requested an attorney. Counsel did ask Hennessy what he told Straughter about the homicide, and Hennessy responded: "I told him about the homicide we were investigating. All I said, it happened in a mobile home park near where he lived." Counsel then asked whether Hennessy told Straughter that he was a suspect, and Hennessy responded: "I did say that his fingerprint was found in the crime scene and, yes, I would guess he would infer that he was a suspect by me telling him that his fingerprint was found at the crime scene." Hennessy was asked whether he told Straughter that things would go easier for him if he talked, and Hennessy responded: "No, there was no reason to say that, no."

The district court made no fact finding on the record about whether Straughter requested an attorney any time during the questioning.

Straughter testified at the suppression hearing that he requested counsel when "homicide" was mentioned. He did not say that he requested an attorney concerning the auto theft interrogation. His request for an attorney concerning the homicide interrogation is contradicted by Hennessy's testimony and Straughter's initials and signature on the second *Miranda* form, stating that he was willing to talk to police. His signature on that form also contradicts his testimony at the suppression hearing that he never saw or signed that form.

The standard of review concerning the admission of custodial statements is whether there is substantial competent evidence to

support the district judge's finding that the confession was voluntary. *State v. Brown*, 258 Kan. 374, 394, 904 P.2d 985 (1995).

Substantial evidence is evidence which possesses both relevance and substance and furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *State v. Ratley*, 253 Kan. 394, Syl. ¶ 2, 855 P.2d 943 (1993). The appellate court accepts as true the evidence and all inferences to be drawn therefrom supporting the findings of the trial court. 253 Kan. at 398. If we find substantial evidence, we affirm the district court's ruling on a motion to suppress. We do not substitute our view of the evidence for the view of the district court. *State v. Gideon*, 257 Kan. 591, Syl ¶ 7, 894 P.2d 850 (1995).

The State bears the burden of proving by a preponderance of the evidence that a confession or admission is voluntary. *State v. Lewis*, 258 Kan. 24, Syl. ¶ 4, 899 P.2d 1027 (1995).

## Right to Counsel

We have recently restated the rules concerning custodial interrogation—the right to remain silent and to the presence of counsel before interrogation. *State v. Matson*, 260 Kan. 366, 373-74, 921 P.2d 790 (1996).

In *Matson* we referenced key United States Supreme Court decisions on an accused's right to counsel: *Arizona v. Roberson*, 486 U.S. 675, 687, 100 L. Ed. 2d 704, 108 S. Ct. 2093 (1988); *Edwards v. Arizona*, 451 U.S. 477, 481-82, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981); *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980); *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975); and *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

We do not read either *Edwards* or *Roberson* as requiring the suppression of Slaughter's statements to Hennessy.

Although *State v. Newfield*, 229 Kan. 347, 623 P.2d 1349 (1981), was decided before *Edwards* and *Roberson*, the *Newfield* facts are similar to this case. After Newfield voluntarily came in for questioning concerning the death of a Peabody banker, he was given

*Miranda* warnings, and he agreed to talk to Kansas Bureau of Investigation (KBI) agents. Newfield made several incriminating statements, but as the questioning continued, he stated that he wanted to talk to a lawyer before answering any more questions. After being given the opportunity to call an attorney, Newfield declined and agreed to accept appointment of a public defender. A KBI agent then said that if Newfield wanted to talk to the KBI, it would have to be now because his attorney would tell him not to talk to the KBI. He asked Newfield to think it over, because the people of Peabody would probably think more of Newfield if he told the truth than if he did not. Newfield was then advised that he was being arrested for the kidnapping and murder of the banker and he would be fingerprinted. Five minutes after requesting counsel, Newfield agreed to continue talking with the agents without counsel and provided a full account of his involvement. After his convictions, Newfield raised on appeal the issue of the district court's refusal to suppress his statements. Relying on *Miranda*, *Mosley*, and *Innis*, we affirmed. 229 Kan. at 358.

Straughter argues that *State v. Carty*, 231 Kan. 282, 644 P.2d 407 (1982), supports his position. Carty, a school janitor, was arrested and placed in the county jail for a Texas parole violation. Investigations were underway for two recent fires, both in buildings where Carty had been custodian. A deputy sheriff brought Carty to the county attorney's office for questioning about the fires. Carty was given his *Miranda* warnings. Carty stated that if they were going to charge him in connection with the two fires, he wanted an attorney. The deputy advised Carty that he was not there for that purpose and all the deputy wanted to do was talk to him. However, Carty was the only suspect in both fires at that time. During the interview, Carty made incriminating statements. Noting that the fact of a request for counsel was not disputed, we reversed Carty's arson and aggravated arson convictions and remanded, concluding that his statements were inadmissible. 231 Kan. at 289.

*Carty* is distinguishable. Straughter's request for counsel is disputed. Straughter initiated communication with Hennessy when the homicide investigation was mentioned.

Straughter claims that the district court did not rule on the issue of whether he requested counsel. Straughter argues that the only testimony in the record on this issue was his own, and further suggests that we remand the case to the district court for proper fact findings on this issue, if we do not rule on it. However, as previously discussed, other evidence contradicted Straughter's testimony.

Even assuming Straughter initially requested counsel, as in *Innis* and *Newfield*, he could change his mind and talk to police without counsel—if he initiated this change without interrogation from the police. Did Hennessy, after Straughter stated he did not want to talk about the auto theft case, improperly continue the interrogation? Hennessy's statement to Straughter that Straughter did not have to talk about the auto theft case or the homicide he was investigating was not something that the police should reasonably know would be likely to elicit an incriminating response from Straughter. The statement gave Straughter the opportunity to talk to the police about the murder case. However, the statement required no response from Straughter. Instead, Straughter asked, "[W]hat homicide?" Hennessy then described the homicide investigation to Straughter, who expressed a willingness to talk about it.

## Right to Remain Silent

Straughter argues that under the *Mosley* factors, 423 U.S. at 104-06 (whether questioning ceased upon request; whether a significant period of time passed before the second questioning on an unrelated matter; and whether *Miranda* rights were given again), the police did not "scrupulously honor" his right to cut off questioning. Hennessy continued to "interact" with Straughter after Straughter said he did not want to talk about the auto theft case. Hennessy told Straughter that his fingerprint was on the pellet gun, encouraging Straughter to explain. There was no gap between questioning.

Straughter attempts to distinguish his situation from *State v. Dixon*, 252 Kan. 39, 843 P.2d 182 (1992), in which we affirmed the district court's refusal to suppress a taped statement by Dixon to police concerning the shooting of his wife. Dixon was advised

of his *Miranda* rights when he was first taken into custody and declined to undergo interrogation. Another detective was assigned to transport Dixon to the police department. During the drive, Dixon volunteered some incriminating statements, without any questions from the detective. Dixon continued to talk about the incident, and the detective placed Dixon in an interview room. Dixon was given his *Miranda* warnings again and then agreed to answer questions about the shooting. We noted that Dixon initiated the discussion with the detective and, without encouragement, demonstrated his willingness to discuss the shooting. Dixon waived his rights after he was given the second *Miranda* warning. 252 Kan. at 52.

Hennessy's statement to Straughter that he did not have to talk about the auto theft case or the homicide under investigation, unlike in *Dixon*, could be viewed as inviting further inquiry from Straughter. However, under *Innis*, police are not subject to a blanket prohibition from saying anything about the crime under investigation to a defendant in custody who has declined interrogation. No blanket prohibition is imposed even if the defendant has also requested counsel, if what is said is not considered interrogation. Hennessy's informing Straughter that the police had found his fingerprint on the pellet pistol recovered from the mobile home in response to Straughter's question, "[W]hat homicide?", is not improper interrogation. Hennessy's interaction with Straughter is within the bounds of *Newfield*.

Straughter was given *Miranda* warnings before every statement he made to police. The only question is whether he voluntarily waived his right to remain silent and his right to counsel in making his statements to police. We find no error in the district court's refusal to suppress Straughter's statements.

## Voluntariness

Straughter argues that his statements to the police were involuntary because he was promised he would not be charged with murder if he cooperated. Hennessy denied making any promises to Straughter. The district court observed: "It boils down to the

issue here of whether such statements [by the police] were made." The district court ruled:

"The issue then was or the issue is this: Was Mr. Straughter justified in relying on a belief which he firmly held in his own mind at the time, and I must resolve that in favor of the State from all the facts and circumstances here. I'm going to overrule the motion at this time in the case."

Although the district court did not expressly find that the police did not make any promises to Straughter, such a finding is implicit in the ruling. Straughter's argument that the district court resolved the facts in his favor at the suppression hearing, based on the district court's framing of the issue, is contrary to the record. Had the district court accepted Straughter's witnesses' testimony as true and discounted Hennessy's testimony, then Straughter's statements to the police would be involuntary. See *State v. Brown*, 217 Kan. 595, 602, 538 P.2d 631 (1975) (A positive promise of benefit resulting in the making of a confession renders it involuntary.).

Although the evidence at the suppression hearing was disputed, there is substantial competent evidence, based on Hennessy's testimony, to support the district court's determination that Straughter's statements were voluntary. Straughter was 18 years old, literate, and able to communicate well with Hennessy. He was picked up at midday on December 1, 1994. Although Straughter remained in the interview room for approximately 8 hours and had his right hand secured to the table, the questioning sessions lasted a total of approximately 3 and ½ hours and were broken up with the visits from Straughter's mother and her boyfriend. After initially being uncooperative, Straughter cooperated when the homicide case was brought up. Straughter consented to the search of his apartment. He was allowed to leave the interview room to get a drink of water and take a restroom break and was given a Pepsi, although he was not fed until taken to the detention facility.

### Evidence That Straughter Initially Invoked his Right to Remain Silent

The admission of evidence is governed by its relevancy to the issue in question. Exclusion is within the discretion of the district court. *State v. Knighten*, 260 Kan. 47, 53, 917 P.2d 1324 (1996).

The balancing of probative value and prejudicial effect is also within the district court's discretion. Discretion is abused only when no reasonable person would take the view adopted by the district court. 260 Kan. at 55.

The district court ruled that no reference could be made to Straughter's auto theft charge, but the State would be allowed to show that Straughter exercised his *Miranda* rights. The district court decided that "it would be prejudicial to the State to not be able to cover gaps in the amount of time related to this interview."

In justifying why Straughter's exercise of his rights with respect to the auto theft case was relevant, the State argued at the hearing on the motion in limine:

"[B]ecause it's an unrelated case, number one, I don't think it's prejudicial; and number two, part of the defense is that, Hey, my client, this kid, was tricked. So the credibility of the cops is on the line, and also whether this is a kid or a young man.

"And here's a guy saying, I ain't going to talk to you guys; and he has the head smarts to say, I'm invoking. I'm not talking to you guys. And then he turns around and says, Oh, yeah, I'll talk to you about that murder, and then a whole litany of other stuff happens after that as to what he says.

"And so I think it's partly my need for the jury to know this is not a kid that was tricked."

No reference to the auto theft charge was made during trial. The auto theft charge was called an "unrelated incident" and was mentioned only in connection with Straughter's initial decision not to talk to the police.

Straughter argues that the district court's admission of his refusal to answer questions on the unrelated incident was an abuse of discretion because it was irrelevant and highly prejudicial. Straughter asserts that the State's concern about police credibility was improper, unless Straughter attacked it, which he did not.

The admission of an invocation of the *Miranda* rights for impeachment purposes is a constitutional violation. *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976); see *State v. Higgins*, 243 Kan. 48, 51, 755 P.2d 12 (1988). Straughter acknowledges that the State did not use his exercise of *Miranda*

rights for impeachment purposes, but contends the admission was highly prejudicial.

The State's position is that: (1) Straughter's arrest and the circumstances leading up to the statements were relevant, and (2) the statements were not introduced to prove Straughter's predisposition to commit crimes. The State reasons that Straughter's uncooperative attitude concerning interrogation regarding the unrelated incident, followed immediately by his willingness to talk about the homicide, are relevant to the circumstances surrounding his statements to police. K.S.A. 22-3215 governs motions to suppress confessions or admissions. K.S.A. 22-3215(5) provides:

"The issue of the admissibility of the confession or admission shall not be submitted to the jury. The circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission."

To the extent that the circumstances surrounding Straughter's statements were admitted to bolster the credibility of the police, Straughter's argument is correct. Police credibility was not in issue. However, such evidence is relevant to the credibility of the statements themselves. See State v. Copridge, 260 Kan. 19, 26, 28, 918 P.2d 1247 (1996).

Here, the jury was never told what the unrelated incident was, only that Straughter did not want to answer questions about it. Hennessy did not even testify that Straughter was arrested on December 1, 1994, for the unrelated incident. He did testify that at the time of the arrest, he had information leading him to believe Straughter might have knowledge or be involved in the homicide. Straughter's willingness to talk about the homicide, immediately following his unwillingness to talk about the other matter, would bear on the credibility of his statements to police about the homicide.

We find no abuse of discretion in allowing the State to put in evidence of Straughter's decision not to talk about the unrelated incident to the police. It was relevant to show the circumstances surrounding his statements to police about the homicide.

### Foreseeability

Straughter requested that the jury be given PIK Crim. 3d 54.06 on foreseeability, which provides:

"A person who intentionally (aids) (abets) (advises) (hires) (counsels) (procures) another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable."

Straughter acknowledges that he intended to enter Brown's mobile home to take guns, but claims it was not foreseeable that one of the group would take a VCR when no guns were found. Straughter argues that because aiding and abetting is a specific intent crime, citing *State v. McDaniel & Owens*, 228 Kan. 172, 178-79, 612 P.2d 1231 (1980), the State must prove that he specifically intended to aid and abet the taking of the VCR. Straughter also relies on *State v. Davis*, 4 Kan. App. 2d 210, 217, 604 P.2d 68 (1979) ("The State cannot hold an accomplice liable for a crime totally unforeseeable.").

Neither aggravated robbery nor aggravated burglary require proof of intent to take a specific item of property. K.S.A. 21-3427; K.S.A. 21-3716. Straughter's statement showed that he actively participated in all phases of both the aggravated burglary and the aggravated robbery. He looked for the guns while others held Brown. When Brown began struggling, Straughter helped subdue him by knocking him down. The fact that one member of the group took a VCR instead of guns, when no guns were found, raises no foreseeability issue. Straughter and the others entered Brown's mobile home armed and intending to take property by force, which they did after inflicting bodily harm. The district court did not err in refusing to give the foreseeability instruction.

Affirmed.