No. 84,029

STATE OF KANSAS, *Appellee*, v. WILLIAM D. ALBRIGHT, *Appellant*.

(24 P.3d 103)

Opinion filed June 1, 2001.

*Michael S. Holland*, of Holland and Holland, of Russell, argued the cause and was on the brief for appellant.

*Athena E. Andaya*, assistant attorney general argued the cause, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: William Albright appeals both his conviction for first-degree premeditated murder, K.S.A. 21-3401(a), and the imposition of a hard 40 sentence under K.S.A. 21-4638.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a conviction resulting in a hard 40 sentence is reviewed by this court).

The trial phase issues raised by Albright are whether the district court erred: (1) in violating his right to confrontation by disallowing a witness to be cross-examined about a grant of immunity; (2) by refusing to instruct the jury on the lesser included offense of second-degree murder; (3) in admitting expert testimony; and (4) by denying his motion for a mistrial. Albright also asserts that his conviction was not supported by sufficient evidence.

In addition to the trial phase issues, Albright asserts the district court erred by imposing a hard 40 sentence.

Finding no error, we affirm.

## FACTS

On Saturday, November 14, 1998, Albright and David Barker, the victim, went to visit Jason Hoffine in Cheney, Kansas. Albright wanted two things—a new life in Mexico and money from Hoffine. Barker's wife Carolyn and Albright's girlfriend Susan Marie Cantrell were at Teddy Bares, a local club. Carolyn left to go home to pick up a "quarter" of cocaine for Cantrell. Carolyn's stepson told her that the police had just searched Barker's house for a meth lab. Carolyn told Cantrell about the raid. Cantrell informed Albright and Barker. Albright, Cantrell, Barker, and Carolyn decided to stay together in a room at the Red Carpet Inn in Wichita that night. The women went to sleep. The men stayed up all night talking and trying to figure out who had called the police about a meth lab.

The next day, the four met around 4 or 5 p.m. at the motel. Barker and Albright talked about returning to Hoffine's to sell Barker's 1961 Chevrolet Impala for $2,000 cash. The two men went to Barker's house, picked up the car, returned to the motel between 7:30 and 8 p.m., and unloaded the car. Originally, Barker wanted to give the car to his granddaughter, but Albright convinced him to sell it.

Around 9:15 p.m., the two women left the motel to go to the Cowboy Club. Carolyn noticed that Albright had a 9-mm hand gun, which belonged to a friend, Stephen Jeffrey Phillips. Barker carried two guns and a pocket knife. Albright and Barker left to talk to Hoffine about the 1961 Impala. The women returned to the motel around midnight or 1 a.m. on November 16, 1998. Albright and Barker were supposed to meet them, but the men did not return that night.

Around 4 a.m. the morning of November 16, Albright unexpectedly arrived alone at Hoffine's house driving Barker's Impala. Albright told Hoffine that he would take just about anything for the Impala, although days earlier, Barker had tried to convince Hoffine that the car had been appraised at $3,300. The car's ignition switch could be activated without a key. Albright did not have the keys, but he had the unsigned title certificate. In Hoffine's

presence, Albright forged David Barker's signature in signing over the title.

Albright fabricated a story that Hoffine believed he was supposed to repeat if questioned. The story was that around 11:30 p.m. or 12 a.m., Barker and Albright came to Hoffine's house, Hoffine gave Albright some money, but Barker left with a Mexican driving a blue Suburban. Hoffine testified that Albright called Cantrell from his house and told her the same story. After buying the Impala, Hoffine drove Albright back to the motel in Wichita.

The actual events did not coincide with Albright's fabricated story. Hoffine testified that after Albright arrived at his house, Albright washed his hands and arms because he was concerned about "ballistics" testing. Then, Albright told Hoffine that he shot Barker in the back of the head while Barker stood behind the Impala. Albright said he shot Barker in a town about 26 miles from Cheney. He also told Hoffine that he left Barker's body lying beside the road and that the body should be found fairly soon.

According to Phillips' testimony, that evening Albright and Phillips left for Oklahoma to visit a man that Albright called "Dad." While on the trip to Oklahoma, Albright told Phillips that he shot Barker in the head while Barker stood by the trunk of the Impala. He also told Phillips that he used Phillips' 9-mm Ruger.

Phillips testified that he had two 9-mm Rugers. The only differences in the two guns were the serial numbers and the engravings on one of the guns. Phillips said he lent Albright one of his 9-mm Rugers, but Albright returned it on Saturday, November 14. Phillips placed the gun in the kitchen drawer, and Albright knew where Phillips usually kept the gun. When Phillips looked for the gun on Sunday, November 15, it was gone. Albright told Phillips that after he shot Barker, he took the 9-mm Ruger apart and got rid of it. The Ruger admitted into evidence at trial was not the one used to kill Barker, but was the other 9-mm Ruger owned by Phillips.

Phillips testified that Albright said he killed Barker because Barker was going to have Phillips and Phillips' mom, niece, and nephew killed. Albright told him that Barker thought Phillips had called the police about raiding Barker's house for drugs. Phillips

said he did not know about Barker's threats until Albright told him on the trip to Oklahoma.

At about 8 a.m., Monday, November 16, a Kingman County farmer found Barker's body lying in the middle of the road. An autopsy revealed that Barker died from a gunshot wound to the back of his head. Dr. Corrie May, a forensic pathologist, testified that in her opinion, the death was a homicide. Forensic testing showed that tissue scraped from the rear quarter panel of the Impala was consistent with Barker's DNA.

Police found a .380 caliber bullet where Barker's body was found. Phillips testified that he loaded both of his Rugers with 9-mm ammunition. He did not have any .380 caliber ammunition in his home. During a search of Albright's home, the police found .380 caliber ammunition. A forensic scientist testified that using .380 caliber ammunition basically turned the semiautomatic Ruger into a revolver capable of firing only one shot.

A special agent from the Kansas Bureau of Investigation (KBI) testified that the tire impressions found at the scene were consistent with the Impala. Barker's boots had a metal horseshoe or tap affixed to the heels. According to the KBI agent, the person who exited the driver's side of the Impala, while it was parked at the scene, wore boots consistent with the boots worn by Barker. Other prints were consistent with the boots worn by Albright on the day Barker was killed. Barker's knife, two guns, and keys were found undisturbed on his body.

Albright was found guilty and convicted as charged by a jury. At a hearing on post-trial motions and sentencing, Albright's motion for directed verdict and motion for a new trial were denied. His motion for a mistrial also was denied. The district court then proceeded to sentencing. Albright was sentenced to a life sentence without the possibility of parole until he served 40 years of his sentence. The district court based Albright's sentence upon the aggravating factor that the crime was committed for the purpose of receiving money or any other thing of monetary value. No mitigating factors were presented by Albright.

## DISCUSSION

First, Albright contends that the district court erred by limiting

the scope of the cross-examination of Jason Hoffine. The Confrontation Clause of the Sixth Amendment to the United States Constitution affords an accused the right to cross-examination. The United States Supreme Court has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). The district court's decision here concerning the scope of cross-examination is reviewed under the abuse of discretion standard. See *State v. Lyons*, 266 Kan. 591, 601-02, 973 P.2d 794 (1999).

Hoffine testified that: (1) Albright said he shot Barker in the back of the head, (2) Hoffine purchased the Impala for $200, and (3) Albright forged Barker's signature on the title certificate in his presence. At the preliminary hearing, Hoffine had testified that he paid $500 for the Impala. On cross-examination at trial, defense counsel asked Hoffine about his inconsistent testimony regarding whether he purchased the car for $200 or $500:

"Q: [Defense counsel] You had a couple hundred on you and about three hundred more in your room, didn't you?
"A: That is right.
"Q: So it wouldn't be $200?
"A: $200 for the car, yes, sir.
"A: Well, what's the other $300 for, drugs?
"A: I wish not to answer."

The district court clarified that Hoffine had invoked his Fifth Amendment right against self-incrimination. The State then granted Hoffine immunity from prosecution for the sale of any controlled substances that took place with Albright at Hoffine's home on November 16, 1998. The court ruled that although defense counsel could ask Hoffine about the "$500, $200, $300 question," counsel could not ask whether Hoffine was testifying because of a grant of immunity. Then, the cross-examination continued:

"Q: . . . I believe you testified that you paid [$]500 at the preliminary hearing, but you're telling us today that you paid [$]200 for the car?
"A: Yes, sir.
"Q: Plus another $300, for a total of $500?

"A: At the preliminary it was . . . [$]200, plus I got [$]300 out of my bedroom to make [$]500 total. And therefore today I said $200. And that [$]200—period. I agree with what you said—

"Q: Okay.

"A: —in the past.

"Q: What was the additional $300 for?

"A: The additional $300 went—when [agents of the Kansas Bureau of Investigation] came to my house in relation with the car, it was said that, upon me, that the State would pay me for giving up the car to them for the price I had within [sic] it. So therefore I did say $500 at this point in time and I stuck by it. So therefore that was the, the discrepancy between the two and the five. That's why I said five, because of an issue of being reimbursed.

"Q: So we were going to make a quick [$]300 bucks at the expense of the Kansas Bureau of Investigation?

"A: (Witness nodded head).

"Q: Would that nod be a yes, sir?

"A: Yes, sir.

"Q: Then at the preliminary hearing you said that you did give Mr. Albright $500?

"A: I gave two, and then I gave three, because the answer was two.

"Q: Okay. Well, then what was the $300 that you gave Mr. Albright, the additional $300?

"A: I did not.

"Q: Okay. So, when you testified at the preliminary hearing that it was $500, that's incorrect now?

"A: Yes, sir.

"Q: It was incorrect then, excuse me.

"A: Yes.

"Q: So that wasn't truthful then, was it?

"A: No, sir."

The district court relied upon *State v. Montanez*, 215 Kan. 67, 523 P.2d 410 (1974), in finding that Hoffine's immunity did not need to be disclosed to the jury. In *Montanez*, we said:

"The ultimate test in each case in determining whether the testimony of a witness who has thwarted cross-examination by invoking his privilege against self-incrimination must be whether the defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness' direct testimony." 215 Kan. 67, Syl. ¶ 4.

We noted that a distinction is generally drawn between invoking the privilege as to "direct" matters, as opposed to "collateral" mat-

ters, where it is not required to strike the direct testimony. 215 Kan. at 70. Here, the district court noted that Hoffine's implication in a drug sale had nothing to do with the alleged murder of Barker.

Albright relies on *Delaware v. Van Arsdall*, 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986), in support of his contention that Hoffine should have been cross-examined on the immunity issue. In *Van Arsdall*, defense counsel sought to impeach a witness (Fleetwood) by questioning him about the dismissal of criminal charges against him. Outside the presence of the jury, it was found that a drunkenness charge had been dropped in exchange for Fleetwood's promise to speak with the prosecutor about a murder. The district court barred any cross-examination of the agreement. *Van Arsdall* observed that a trial judge is not prevented from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness. However, the opinion pointed out that in Van Arsdall's case, the district court had prohibited *"all* inquiry into the possibility that Fleetwood would be biased" because of the dismissed charge. The Supreme Court found that the district court's ruling violated Van Arsdall's right to confrontation. 475 U.S. at 679. *Van Arsdall* concluded that a harmless error analysis would apply, reversed the Delaware Supreme Court, and remanded the case for a harmless error determination. 475 U.S. at 684.

Albright argues here that the jury might have reached a "significantly different impression of Hoffine's credibility" if defense counsel had cross-examined him concerning the State's granting immunity for the drug transaction that might have occurred between Hoffine and Albright. We disagree.

A review of the trial transcript shows that Hoffine's credibility regarding the sales amount was attacked through cross-examination. Moreover, Albright fails to acknowledge that even if the district court erred in limiting the cross-examination, the error was harmless. The State points out that Hoffine's credibility was attacked by showing that he changed his testimony regarding the amount involved in the purchase of the car. Also, his testimony regarding the $500 fictitious sale price paid by the State for the Impala placed Hoffine's dishonesty squarely before the jury. (He admitted he made a "quick $300 bucks" at the expense of the KBI.)

Moreover, Phillips, Barker's friend and neighbor, testified that Albright told him that he killed Barker. Phillips' testimony corroborated the testimony of Hoffine regarding Albright's account of the murder. Under the facts here, we find no abuse of discretion.

### The Second-Degree Murder Instruction

Next, Albright argues that the district court erred by refusing to instruct the jury on the lesser included offense of second-degree murder. Albright requested the Pattern Instructions for Kansas (PIK) Crim. 3d 56.03 (1999 Supp.) standard second-degree murder instruction.

First-degree premeditated murder is the killing of a person committed intentionally and with premeditation. K.S.A. 21-3401(a). Second-degree murder, a lesser included offense of first-degree murder, is the killing of a human being intentionally without deliberation or premeditation. See K.S.A. 2000 Supp. 21-3402. However, in Albright's case, the district court found that the evidence did not support a second-degree murder instruction. We examine the merit of the district court's ruling by observing, there is "[n]o duty to instruct the jury on a lesser included offense . . . where the evidence as a whole, viewed in the light most favorable to the defendant, could not reasonably support a jury verdict on the lesser included offense." *State v. Simkins*, 269 Kan. 84, 90, 3 P.3d 1274 (2000). A review of the trial record supports the district court's ruling.

Albright cites several cases to bolster his contention that a second-degree murder instruction should have been given.

We next consider those cases, concluding that none are persuasive when compared with the facts here. In *State v. Sanders*, 258 Kan. 409, 904 P.2d 951 (1995), *superceded by statute as stated in State v. Bedford*, 269 Kan. 315, 327, 7 P.3d 224 (2000), we pointed out that the law does not presume the existence of premeditation or deliberation. 258 Kan. at 414. The question on appeal "is not whether there was sufficient evidence of premeditation but whether there was sufficient evidence to require the trial judge to instruct on the lesser included offense of second-degree murder." 258 Kan. at 415. We noted in *Sanders* that the sufficiency of an

inference of premeditation is not conclusive in determining whether the evidence supported an instruction on the lesser included offense. 258 Kan. at 415. The victim in *Sanders* was killed late at night in her own home. There were neither signs of a struggle, nor of defensive injuries. Sanders testified about his actions that night. He denied killing the victim. If the murder weapon was taken from the kitchen drawer, the jury could have inferred that Sanders did not premeditate the killing before going to the victim's house. Either inference, premeditation or no premeditation, could have been drawn from the evidence. Sanders' first-degree murder conviction was reversed because the evidence at trial did not exclude a theory of guilt on the lesser offense of second-degree murder. 258 Kan. at 415-16. We observed in *Sanders*: "However, the duty to instruct on a lesser included offense 'does not arise unless there is evidence supporting the lesser offense.' [Citation omitted.]" 258 Kan. at 413.

Albright also relies on *State v. Dixon*, 252 Kan. 39, 843 P.2d 182 (1992), *superceded by statute as stated in State v. Shannon*, 258 Kan. 425, 429, 905 P.2d 649 (1995), *State v. Johnson*, 220 Kan. 720, Syl. ¶ 1, 556 P.2d 168 (1976), and *State v. Broadus*, 206 Kan. 766, 481 P.2d 1006 (1971). He opines that the jury here could have concluded that there was no premeditation. He suggests that the jury could have inferred that Barker and Albright argued over either the sale of the Impala or a cocaine deal and that, because of the argument, Albright shot Barker. He points out that Barker was also armed. According to Albright, even with the "alleged admissions," there was neither an explanation for the shooting, nor why he and Barker drove to that location and got out of the car.

The district court noted that the defense theory of the case was that Albright was not present and did not commit the crime. Albright argues that the mere fact that the defendant denies committing the act does not deprive the defendant of his requested instruction on the lesser included offense. We agree with Albright on this point. See *State v. Coleman*, 253 Kan. 335, 354-55, 856 P.2d 121 (1993).

The evidence here precluded a second-degree murder conviction. A brief review of the evidence is appropriate. While Albright

and Barker were at Hoffine's house on November 14, Barker took a call from Cantrell. She told him about the drug raid. When Barker got off the phone, he was angry and mentioned that his neighbor Phillips had "narked." He said he "ought to kill" Phillips. Before they left, both Albright and Barker showed Hoffine that they carried guns. Albright said he had one of Phillips' 9-mm guns.

Carolyn Barker testified that on the night of the murder, she heard Albright tell her husband that "he knew" Hoffine would buy his 1961 Impala that night for "$2,000 cash." However, Hoffine testified that he and Barker had never talked about a purchase price. Barker and Albright had previously talked to Hoffine about the $3,300 appraised value of the Impala on the night of November 14, but Hoffine had not been interested in purchasing the car. After the murder, Albright drove the car to Hoffine's home. Hoffine agreed that it was unusual for Albright to visit him at 4 a.m. Albright then forged the title certificate, selling Barker's Impala to Hoffine for $200.

Albright had returned Phillips' 9-mm gun on Saturday, the day before the murder. On Sunday, Phillips noticed that the gun was missing. After the murder, Albright told Phillips that he used the gun to kill Barker. The ammunition found at the scene of the crime was .380 caliber ammunition, which was also found in Albright's home. Albright told Phillips that he killed Barker because Barker threatened to kill Phillips and Phillips' family.

In *State v. McClanahan*, 254 Kan. 104, 109-10, 865 P.2d 1021 (1993), we endorsed the lesser degree instruction statement we made in *State v. Marks*, 226 Kan. 704, 602 P.2d 1344 (1979):

" 'In order for the evidence to be sufficient to require instructions on lesser degrees of the homicide, the testimony supporting such instructions must be offered either by the State or by the defense for the purpose of proving what events occurred at the time the homicide was committed. Contradictory statements of a witness which are offered only for the purpose of destroying his credibility and not as positive evidence to prove the matters contained in the statements are not alone sufficient to require an instruction on the lesser degrees of homicide.' 226 Kan. at 714."

What evidence to support an instruction on second-degree murder was advanced by Albright at trial? At the instruction conference,

Albright's counsel, arguing in support of the lesser included instruction, emphasized Exhibit number 33 and photographs that were admitted. Exhibit 33 was the exhibit of the crime scene. Counsel concluded:

"That bit of factual testimony that has been, and the diagram and the photograph, indicates to me that this is a situation where perhaps whomever shot David Barker occurred in an argument. You will recall Mr. Barker was armed, he had two guns, he had a sheath knife, I believe, in the back of the belt. Had a couple of pocket knives. Dr. Moots brought that out, as well as Special Agent Klamm.

"That . . . would lead me to believe that there is some evidence, however weak, however slight, that while indeed the shooting may very well be intentional, that there was not premeditation, that this may have occurred as a result of an argument, a scuffle, I don't know. But I think if you look at those facts, you'll find that that would warrant the issuance of at least the instruction of second degree intentional."

Neither Exhibit 33 nor the photographs are in the record on appeal. Albright carries the burden of furnishing a record which shows prejudicial error occurred at trial. *State v. Moncla*, 262 Kan. 58, 68, 936 P.2d 727 (1997).

The district court did not err by refusing to instruct the jury on second-degree murder.

### Expert Testimony

Albright contends that the district court erred in permitting Victoria Moots, D.O., the deputy county coroner, to testify as to her expert opinion. We disagree.

An abuse of discretion standard of review generally governs the admissibility of evidence, including expert testimony. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999). When reviewing the erroneous admission or exclusion of evidence, the error is harmless if no substantial right of the defendant is involved. *State v. Bornholdt*, 261 Kan. 644, 660, 932 P.2d 964 (1997).

Albright objected to Dr. Moots' opinions concerning pressure necrosis, or tissue deterioration similar to bed sores. Albright based his objections on lack of qualifications and lack of foundation. Dr. Moots developed her opinions from personal observation of the victim and from data presented to her at trial.

Dr. Moots was asked about pressure necrosis on Barker's knees and shoulders, allowing her to give an expert opinion regarding the time frame of Barker's death. Pressure necrosis occurs before death. Dr. Moots testified that any pressure necrosis takes a "number of hours," more than 4, to occur. She also observed that, based on the blood at the scene, Barker lived for a period of time after the shooting. Although Dr. Moots could not tell the exact time it took Barker's pressure necrosis to have developed, she testified that his body was warm to the touch at 9:30 a.m. when she arrived at the scene of the shooting.

Albright argues that the district court should have excluded Dr. Moots' testimony because she was not formally trained in forensic pathology or in calculating the specific "time required for pressure necrosis to develop in a person of [Barker's] age." The record shows that although Dr. Moots did not physically examine Barker for signs of pressure necrosis, she examined photographs of Barker. She testified that she had a large geriatric practice and had experience and training in treating bed sores and that pressure necrosis was "basically the same" as a bed sore. Dr. Moots also had been trained in evaluating a death scene and determining an estimated time of death. She received training in forensic pathology in continuing education courses.

Albright also asserts that there was no foundation to show that Dr. Moots' opinion for the time needed for pressure necrosis to develop was generally accepted as reliable within the expert's particular scientific field. However, he fails to recognize that Dr. Corrie L. May, a forensic pathologist and District Coroner of Sedgwick County, also testified concerning pressure necrosis in giving her expert opinion regarding Barker's time of death. We find no abuse of discretion.

## The Motion for a Mistrial

Albright contends that the district court erred by denying his motion for a mistrial. He argues that State's Exhibit 82, the coroner's report written by Dr. Moots, which was not admitted into evidence, was erroneously submitted to the jury, warranting a mistrial. While the State agrees that the report was inadvertently and

erroneously submitted to the jury, it contends that Albright was not substantially prejudiced by the error. We agree.

The decision to declare a mistrial lies within the sound discretion of the district court and will not be reversed absent a clear showing of abuse of discretion. *State v. Rice*, 261 Kan. 567, 592, 932 P.2d 981 (1997).

After the conclusion of the trial, the judge and the court reporter discovered that Dr. Moots' report was inadvertently taken into the jury room. Albright filed a motion for a mistrial under K.S.A. 22-3423(1)(b). K.S.A. 22-3423(1)(b) says:

"(1) The trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because:

. . . .

"(b) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law and the defendant requests or consents to the declaration of a mistrial."

At a hearing on the motion, the district court found that the only fact not testified to at trial, but included in Dr. Moots' report, was the statement that Barker probably died within the previous 2 hours as indicated by the fact the body was warm to the touch at approximately 9:30 a.m. The judge interpreted this statement "as being solely exculpatory. I think it goes directly to the defendant's timeline defense that he wasn't there and didn't do it." The district court also noted that there was no evidence that the jury ever looked at or considered the report. The judge said, "[M]y analysis is it was not in any way prejudicial or harmful to the defendant's case. It was exculpatory and consistent with his defenses. And at most, if [the jury] considered it, it was harmless error in view of the totality of the evidence admitted at this trial."

A review of the record shows that Dr. Moots testified that the victim's body was warm to the touch at 9:30 a.m. However, she was not asked whether this fact showed that Barker had probably died within the previous 2 hours. She did testify that it takes more than 4 hours for pressure necrosis to develop. Albright was not prejudiced by the exhibit's presence during jury deliberations. Under the facts presented, the district court did not err by denying Albright's mistrial motion.

Albright's final contention arising from alleged error at trial is the sufficiency of the evidence issue. This issue lacks merit and requires no further discussion. See *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999), for our standard of review on sufficiency of the evidence issues.

### The Hard 40 Sentence

Albright contends that his hard 40 sentence was erroneous. The district court imposed the hard 40 sentence based upon the following K.S.A. 21-4636 aggravating circumstance:

"(c) The defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value."

We addressed the standard of review for a hard 40 sentence in *State v. Murillo*, 269 Kan. 281, 287-88, 7 P.3d 264 (2000):

"Where the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence. [Citation omitted.]"

We have held that the existence of one aggravating circumstance may alone be sufficient to support a hard 40 sentence. See *State v. Higgenbotham*, 264 Kan. 593, 612, 957 P.2d 416 (1998). Albright offered no mitigating circumstances.

First, Albright argues that the district court erred by considering evidence presented at trial not at the sentencing hearing. He correctly notes that K.S.A. 21-4635(b) requires that "[o]nly such evidence of aggravating circumstances as the state has made known to defendant prior to sentencing shall be admissible" in determining whether the defendant must serve a hard 40 sentence.

At the sentencing hearing, the district court noted that the testimony of the KBI agents consisted primarily of hearsay evidence. However, it said it did not rely upon the agents' statements in making the sentencing determination. The judge also considered Albright's prior criminal record, but said: "I'm not in the over all picture considering those at all dispositive." The judge then said:

"What I'm primarily relying on . . . are the following objective factors that I think were presented at trial of this case by various witnesses and are virtually uncontroverted." The district court found the record showed that Albright: (1) was unemployed at the time of the murder and had no visible means of income or support; (2) made statements to witnesses of his need or desire to have money and his need or desire to get away from his girlfriend; (3) manipulated the events on the evening of November 15, 1998, to isolate Barker; (4) got Phillips' gun for "only one reason"; and (5) sold Barker's car to Hoffine for $\frac{1}{10}$ to $\frac{1}{15}$ the value and received cash for the sale. The district judge observed that there was no evidence of a fight, dispute, or bad blood, or anything else other than a motive for monetary gain.

Here, the district court at sentencing relied on the evidence admitted at trial. Albright was aware of such evidence and had the opportunity to rebut the evidence at the sentencing hearing. See *State v. Perry*, 266 Kan. 224, 235, 968 P.2d 674 (1998).

Albright argues that the evidence "repudiates" the sentencing court's conclusions that the murder was committed for monetary gain. He reasons that had the killing been for monetary gain, Albright would have taken Barker's weapons and cash.

The evidence shows that a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence. The district court did not err in imposing the hard 40 sentence.

Affirmed.