NOT DESIGNATED FOR PUBLICATION

No. 121,942

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRYAN CURTIS BOLDRIDGE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed August 13, 2021. Conviction reversed and sentence vacated in part.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Sherri L. Becker*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE, J., and BURGESS, S.J.

PER CURIAM: Bryan Curtis Boldridge timely appeals his jury conviction for attempted voluntary manslaughter. He was also convicted of criminal discharge of a firearm, criminal damage to property, and theft. He does not challenge those convictions on appeal. Before us, he raises four claims of error challenging his conviction for attempted voluntary manslaughter: (1) There was insufficient evidence to convict him of attempted voluntary manslaughter; (2) the district court made multiple jury instruction errors related to attempted voluntary manslaughter; (3) the district court erred in admitting a photograph of a sign on Boldridge's property stating trespassers would be shot; and (4) cumulative error deprived him of a fair trial. Upon our extensive review of

1

the record, we find the evidence was insufficient to convict Boldridge of attempted voluntary manslaughter—heat of passion. Therefore, we reverse his conviction and vacate his sentence. We also find with this reversal it is not necessary for us to address the other issues raised on appeal.

FACTS

A locked cage had previously been placed around Boldridge's water meter to ensure the water could not be turned on. He was delinquent on paying his water bill. On October 31, 2018, two maintenance workers from the Atchison Water Department, Justin Harmon and Earl Brown, went to Boldridge's home to check if his water was shut off. Harmon and Brown saw the lock and cage had been removed. Harmon called the Atchison Police Department to report suspected theft of services. Atchison Police Officer Darren Kelley was dispatched in response to Harmon's call. Kelley spoke with Harmon and Brown, who told him the lock had been cut off. As Kelley was speaking to Harmon and Brown, Boldridge returned to his residence.

Kelley testified that Boldridge got out of his vehicle and was carrying a military-style rifle as well as a sidearm on his waistband. Boldridge appeared to get agitated and told Kelley and the city maintenance workers they were trespassing and needed to leave his property. Kelley approached Boldridge and told him they were on his property to investigate why the locked cage had been cut off the water meter. Boldridge told Kelley he knew the lock had been cut off and he would "do anything to provide for [his] family." Based on Boldridge's statements, Kelley believed he had probable cause to arrest Boldridge for theft of services and asked Boldridge to walk down to the street so they could talk further. But before walking down to the street, Kelley asked Boldridge to lay down his rifle, and Boldridge complied. Kelley also radioed for back up.

2

When they got to the street, Kelley told Boldridge he was under arrest for theft of services. The relevant portion of their interaction along the street was recorded on Kelley's dash camera video; however, there is no accompanying audio during this timeframe. Boldridge became upset and told Kelley he wanted the police to look for his wife who he had earlier reported missing. Kelley told Boldridge he would be issuing a notice to appear, which would only require taking Boldridge to the police station for fingerprints and a mug shot, then he would be released. However, Boldridge became increasingly upset and began yelling, asserting he was not under arrest and would not go with Kelley. Boldridge then began walking away from Kelley, and Kelley told him to stop multiple times. Kelley claimed Boldridge made a gesture toward his sidearm at which point Kelley drew his taser.

Boldridge asked Kelley not to use his taser, but Kelley did so anyway. Kelley believed the taser did not take full effect but acknowledged it caused Boldridge to stumble. Kelley claimed he saw Boldridge draw his gun, so he drew his own service weapon in response. Kelley testified Boldridge pointed the gun at him and shot it. Kelley tripped as he was backing away from Boldridge and heard another shot as he got up. At that point, Kelley returned fire. In total, Kelley fired 10 rounds in Boldridge's direction. Kelley stopped firing when he saw Boldridge's gun was no longer pointed at him; he approached Boldridge, told him not to move, and held Boldridge at gunpoint until backup officers arrived.

Boldridge testified he came to the house out of concern things were being stolen from his property. Earlier that day he had learned his son was missing from school, so he contacted Atchison Police to talk about it and ask about their investigation of his previous report his wife was missing. When Boldridge arrived at the house, he saw Kelley and the city workers and initially thought Kelley was there to talk about his missing wife and son. Boldridge claimed he put down his rifle on his own accord and also asked Kelley if he should lay down his sidearm, but Kelley told him it was not necessary. Boldridge asserted

3

he asked Kelley and the city workers to get off his property as they were not there to talk about his wife or son; therefore, he believed they were trespassing. He claimed he was not angry and used a normal tone. He acknowledged discussing the issue of the water meter with Kelley when they got near the street and admitted he told Kelley he would do what was necessary to provide for his family.

Boldridge claimed Kelley never told him he was under arrest; his understanding was he would simply receive a notice to appear. Boldridge became nervous when Kelley began gesturing toward his taser. However, Boldridge claimed he did not know whether it was a taser or a gun and it looked like a gun to him. When Kelley reached for his taser, Boldridge believed he was going to be shot. Boldridge testified he asked Kelley what he was doing after he pointed the taser at him. He claimed he did not move or reach for his gun and was afraid he would be killed. Kelley then shot Boldridge with the taser. At that point, Boldridge fell down a small slope on his lawn and reached for his gun. Boldridge claimed he heard shots fired before reaching for his gun. He admitted to pointing his gun and firing in Kelley's direction but claimed he did not intend to kill Kelley; rather, he felt it was the only way to get him to stop shooting.

The State charged Boldridge with one count each of attempted second-degree murder, theft, criminal discharge of a firearm, and criminal damage to property. At the outset of trial, Boldridge pled guilty to theft, and the case went forward on the remaining three charges. At the instruction conference, the district court stated it was going to instruct the jury on attempted voluntary manslaughter committed in the heat of passion as a lesser included offense of attempted second-degree murder. But the district court denied Boldridge's request for an instruction on imperfect self-defense as a basis for attempted voluntary manslaughter. The district court also denied Boldridge's request for a self-defense instruction.

The jury convicted Boldridge of attempted voluntary manslaughter, criminal damage to property, and criminal discharge of a firearm. The district court sentenced Boldridge to 32 months' imprisonment for attempted voluntary manslaughter with 24 months' postrelease supervision, concurrent jail sentences of 12 months for theft and 6 months for criminal damage to property, and a consecutive 30-day jail sentence for criminal discharge of a firearm. Additional facts are set forth as necessary herein.

ANALYSIS

Boldridge argues there was insufficient evidence to support his conviction for attempted voluntary manslaughter.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

To convict Boldridge of attempted voluntary manslaughter, the State needed to prove Boldridge specifically intended to commit voluntary manslaughter. See K.S.A. 2018 Supp. 21-5404(a). The core elements of voluntary manslaughter are an intentional killing and legally sufficient provocation. *State v. Campbell*, 308 Kan. 763, 775, 423 P.3d 539 (2018). An attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 2020 Supp. 21-5301(a); *State v. Louis*, 305 Kan. 453, 460, 384 P.3d 1 (2016). Accordingly, the State had to prove Boldridge acted with legally sufficient provocation in order for us to uphold his conviction. See *State v. Zapata-Grimaldo*, No. 117,831, 2018 WL 6071478, at *3 (Kan. App. 2018) (unpublished opinion).

5

Here, Boldridge focuses on the fact the district court only instructed the jury as to the variation of voluntary manslaughter committed in the "heat of passion." See K.S.A. 2018 Supp. 21-5404(a)(1) ("Voluntary manslaughter is knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion."). Specifically, the district court instructed the jury, in pertinent part, the State was required to prove:

"1. [Boldridge] performed an overt act toward the commission of voluntary manslaughter.
"2. [Boldridge] did so with the intent to commit voluntary manslaughter.
"3. [Boldridge] failed to complete the commission of voluntary manslaughter.
"4. It was done in the heat of passion."

The district court further instructed the jury, in pertinent part:

"The elements of the crime of voluntary manslaughter, if completed are as follows:
"1. [Boldridge] knowingly killed Darren Kelley.
"2. It was done in the heat of passion.
. . . .
"'Heat of Passion' means any intense or vehement emotional excitement which was spontaneously provoked from circumstances. The emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection."

Our Supreme Court has held whether a person acts in the heat of passion is subject to an objective test. It requires an emotional state of mind of such degree as to cause an ordinary person to act on impulse without reflection. The emotional state must arise from circumstances constituting legally sufficient provocation, which is also subject to an objective test—the provocation must be sufficient to cause an ordinary person to lose control of actions and reason. *State v. Gallegos*, 286 Kan. 869, 875, 190 P.3d 226 (2008); *State v. Dixon*, 252 Kan. 39, 45-46, 843 P.2d 182 (1992), *abrogated on other grounds by State v. Albright*, 271 Kan. 546, 555, 24 P.3d 103 (2001).

6

Boldridge asserts he could not have acted with legally sufficient provocation because he was reacting to Kelley's attempt to make an arrest and a person ordinarily cannot use force to resist an arrest even if he or she believes the arrest is unlawful. See K.S.A. 2020 Supp. 21-5227(a) (officer can use force in making arrest); K.S.A. 2020 Supp. 21-5229 (a person cannot lawfully resist arrest even if arrest itself is unlawful). Accordingly, Boldridge asserts the circumstances did not give rise to legally sufficient provocation for the jury to find he acted in the heat of passion because a reasonable person would not have unlawfully resisted an officer's lawful use of force in making an arrest by discharging a firearm in the officer's direction.

We find Boldridge's argument is correct even if the result it mandates feels wrong. Generally, the existence of legally sufficient provocation would make Boldridge's actions less culpable, i.e., the jury could convict him of attempted voluntary manslaughter as opposed to attempted second-degree murder. But, the jury had the option to convict Boldridge of attempted second-degree murder and declined to do so. Its verdict, therefore, stands or fails based on the sufficiency of the evidence for attempted voluntary manslaughter. Our role is to resolve issues of law, not questions of fact or matters of equity. See *Chandler*, 307 Kan. at 668. Here, an essential element of the offense—legally sufficient provocation—is lacking. See *Campbell*, 308 Kan. at 775.

Oddly, the State in its brief did not make any argument the evidence was sufficient. Instead, the State unpersuasively argues any insufficiency in the evidence underlying Boldridge's conviction is the result of invited error. The State incorrectly asserts Boldridge requested an instruction for heat of passion. However, the record reflects Boldridge only asked for an instruction on imperfect self-defense. Boldridge's trial counsel explained he had been "going back and forth" about asking for an instruction on heat of passion in addition to imperfect self-defense. But Boldridge's counsel did not ask for the instruction. Although Boldridge did not explicitly object to the heat of passion

7

instruction, the record shows he did not affirmatively ask for it to be given. Accordingly, the State's invited error argument lacks support in the record.

Other panels of this court have soundly rejected the State's argument in similar contexts. See *State v. LeGrand*, No. 108,389, 2013 WL 6331597, at *14 (Kan. App. 2013) (unpublished opinion) (holding invited rule did not apply even when defendant requested instruction because defendant was challenging sufficiency of evidence); *State v. Creason*, No. 105,450, 2012 WL 3289946, at *4 (Kan. App. 2012) (unpublished opinion) (same); *State v. Folley*, No. 89,368, 2004 WL 1714918, at *1 (Kan. App. 2004) (unpublished opinion) ("[T]he invited error rule simply cannot trump a defendant's right to have every element of the crime proved.").

Ultimately, Boldridge raises a challenge to the sufficiency of the evidence, not the instruction itself. The instruction is relevant to our analysis of the sufficiency of the evidence because the jury's verdict can only stand on the particular means of committing the crime for which it is instructed. See *State v. Johnson*, 310 Kan. 835, 839-40, 450 P.3d 790 (2019). However, the process through which the district court ultimately decided to give the instruction should not be determinative.

The State's argument is particularly unpersuasive as our Supreme Court has held: "[T]here is no backing away from the requirement that the State prove every element of the offense charged by proof beyond a reasonable doubt. The State must do so in order to gain a conviction." *State v. Bethel*, 275 Kan. 456, 474, 66 P.3d 840 (2003). "Under the Due Process clause of the 14th Amendment, no person may be convicted of a crime unless every fact necessary to establish the crime with which he is charged is proven beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)." *State v. Switzer*, 244 Kan. 449, 450, 769 P.2d (1989). No facet of a criminal jury trial could be more essential than the State's burden to prove all elements of

the crime(s) charged beyond a reasonable doubt. Thus, the State's invited error argument is unavailing as a matter of law.

Here, the district court denied Boldridge's request for an instruction on imperfect self-defense as a basis for voluntary manslaughter. The district court also did not instruct the jury on voluntary manslaughter committed as the result of a "sudden quarrel." See K.S.A. 2018 Supp. 21-5404(a)(1). Had either of these instructions been given, Boldridge's attempted voluntary manslaughter conviction would almost certainly have to be affirmed. However, the specific instruction the district court gave here—heat of passion—was erroneous as a matter of law because no reasonable person would believe he or she could discharge a firearm in order to prevent a police officer from making an arrest. See K.S.A. 2020 Supp. 21-5227(a); K.S.A. 2018 Supp. 21-5229. Accordingly, there was no basis for the jury to find legally sufficient provocation underlying Boldridge's actions to convict him of voluntary manslaughter in the heat of passion. See *Gallegos*, 286 Kan. at 875.

We find, given the record before us, there was legally insufficient evidence to support Boldridge's conviction for attempted voluntary manslaughter. With this finding it is not necessary for us to address the other issues raised on appeal by Boldridge. We reverse Boldridge's conviction for attempted voluntary manslaughter and vacate his sentence for that conviction. Because Boldridge did not challenge his other three convictions and sentences on appeal, they are not affected and stand.

Conviction reversed and sentence vacated in part.